Tom PERKINS

v.

EMERSON ELECTRIC COMPANY.

Civ. A. No. 781285.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Jan. 21, 1980.

Russell T. Tritico, Lake Charles, La., for plaintiff.

William M. Nolen, Jones, Patin, Tete, Nolen & Hanchey, Lake Charles, La., Sidney E. Cook, Cook, Clark, Egan, Yancy & King, Shreveport, La., for defendant.

H. O. Lestage, III, Hall, Lestage & Lestage, DeRidder, La., for Boise Southern Co.

VERON, District Judge.

## RULING

This is a suit by Tom Perkins (Perkins) against Emerson Electric Company (Emerson), seeking damages as a result of a chain saw accident which occurred on March 30, 1978, in Beauregard Parish, Louisiana, while plaintiff was employed by Boise Southern Company as a pulpwood cutter.

Plaintiff alleges that he sustained personal injuries while operating a 5200 Beaird-Poulan chain saw which came in contact with an unknown object, causing the saw to "kickback" and strike plaintiff's arm. Beaird-Poulan is a subsidiary of the defendant, Emerson Electric Company.

Plaintiff alleges and contends that his personal injuries were proximately caused by the negligence of the defendants, its agents, servants and employees, in the design of the chain saw in question, as well as, in the distribution of warnings and instructions concerning its operation. In the alternative, plaintiff contends his injuries were caused by the defective and unreasonably dangerous condition of the saw as to its design, manufacture and distribution.

Plaintiff is a citizen of the State of Louisiana and is domiciled in Beauregard Parish, Louisiana. Defendant is a corporation domiciled in the State of Missouri and has its principal place of business in that state. Defendant corporation does business in the State of Louisiana and has an agent for service of process. The matter in controversy exceeds $10,000.00, exclusive of costs and interest. This court has jurisdiction under 28 U.S.C. § 1332.

Perkins had been employed by Boise Southern as a woodcutter for approximately four (4) years. His job consisted primarily of felling trees and limbing trees. He worked with another woodcutter as a team. Usually one member of the team would fell the trees and the other member would limb the trees in the morning and in the afternoon they would reverse the felling and limbing. The trees were up to 60 to 70 feet long.

Tom Perkins was a professional woodcutter, having worked at that occupation for about 20 years. He started as a woodcutter with his father, using a cross cut saw. Later, in the early 60's, he started using chain saws, and continued to use them until his accident on March 30, 1978. Prior to going to work with Boise Southern, Perkins owned a 71–A Poulan chain saw, which he acquired new from Smith's Saw Shop in DeQuincy, Louisiana. He used the saw from the period 1972 to 1975. In fact, he wore this saw out and from then on, all his employers furnished the saws he used.

Perkins testified that he had no training on kickback of chain saws, but he was aware that chain saws would kickback. He had suffered two previous injuries due to kickbacks, once above his right wrist, and a knee injury on the other occasion.

Boise Southern had purchased the 5200 Poulan chain saw in February, 1977, from Smith's Saw Shop, after Perkins told his boss he would like a lighter saw and would like to try the Poulan 5200. This saw was sold to the distributor in October of 1975. The 5200 Poulan was used for several months after its purchased in February of 1977 until it was run over by a logging skidder. It was rebuilt in December of 1977 and used as a backup saw because its bolts would come loose, gas would leak and the saw was not as tight as before the accident.

As of late 1977 Perkins had been using a Stiehl saw, but it was in need of repair and had to go in the shop. So on March 30, 1978, plaintiff used the Poulan 5200. Perkins went to work on March 30, 1978, at 7:00 o'clock a. m., and he felled trees until noon, while his partner did the trimming. After the lunch break, Perkins did the trimming, and his partner did the felling. He was wearing his work clothes—chaps and safety shoes, hard hat, ear plugs and gloves. Shortly before quitting time, as he was trimming branches, the nose end of the bar around which the chain revolves touched something, and the saw kicked back. Plaintiff had some knowledge that if the nose end of the bar touched something it would kickback. As the saw kicked back, Perkins who is left handed, had his right hand

knocked off the handle bar. He threw his right arm up and tried to run away. The accident severely injured Perkins' right arm and hand. He had several surgeries, including successful bone grafts. Nevertheless, plaintiff has been left with an 80 to 85% impairment of the right arm.

Prior to the accident, Perkins had never seen a chain brake on a Poulan saw. He felt that if there had been a chain brake, his hand would have hit it to activate the brake. He also said a chain brake would not affect his work in any way, no more than a hand guard. He further stated he would not turn down a safety tip, and that the safety tip would not get tangled or snagged.

■ Several expert witnesses testified in the case. Plaintiff called as his experts Gary Freimuth and Dr. James J. Brennan. Defendants raised an issue that these experts lacked the qualifications to testify in this case because they had no experience in the design of chain saws or any of their component parts. Gary Freimuth is a mechanical engineer with a bachelor's degree from Newark College of Engineering. He owns a small chain saw and has studied chain saws, including the chain saw which is the subject of this case. He testified in three previous chain saw cases for plaintiffs. He was tendered and accepted as an expert in mechanical engineering. Plaintiff's other expert was Dr. James J. Brennan, a professor of industrial engineering who was tendered and accepted as an industrial engineer. He has studied materials about chain saws. He has under consideration two Homelite saw cases and contends they are defectively designed. He also has two cases involving Stiehl chain saws.

These two witnesses' expertise is in the fields of design engineering and safety engineering as they relate to the field of mechanical engineering.

Acceptance of an expert's qualifications cannot depend on his precise skill or background in a particular profession or industry. If the subject matter (safe design) falls within a person's experience in or overall knowledge of a specialized skill (engineering), this is sufficient to qualify the witness as an expert . . . *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856 (8th Cir. 1975). The court is entirely satisfied that these two experts were qualified.

The product in this litigation is a Beaird-Poulan Model 5200 chain saw which was conceived, designed and developed under Lloyd Tuggle, Senior Vice-President and Chief Engineer of Beaird-Poulan. This saw left defendant's plant on October 29, 1975. According to Mr. Tuggle, this saw was designed for the professional woodcutter, incorporating the most modern features of design and safety known in the chain saw industry at the time it left the plant.

The major issues in this case are whether the chain saw was defectively designed and whether the manufacturer failed to warn the user of the dangers inherent in the use of the saw and methods to avoid serious injuries.

No one disputes the fact that an accident occurred. Neither is it questioned that the tip of the saw came in contact with something and kicked back injuring Mr. Perkins. Defendant's manual gave instructions on the matter of kickback. Perkins contends he never saw the manual, though he was aware of kickback.

Plaintiff maintains that at the time of the accident and long prior thereto, defendant was thoroughly cognizant of the inherent dangers of chain saws, including the matter of "kickbacks." Statistics of hundreds of prior kickback injuries were known to the defendant and the chain saw industry. Plaintiff contends that despite this knowledge, the defendant did very little, if anything, either to make the saw safer or effectively to make known to its retailers and ultimate consumers, methods to avoid the risk of serious injury from kickback.

Defendant contended throughout the trial that the questions about the defective design of the saw must be determined at the time it left defendant's plant on October 29, 1975. Plaintiff, on the other hand, contends these questions must be determined no earlier than the day Boise South-

ern purchased the subject saw in February, 1977. Defendant has cited three cases for the rule of law that plaintiff must first prove that the manufacturer's product was defective at the time it left the manufacturer. Of the three cases, only one makes the statement that it is essential that the defect complained of existed at the time the product left the possession of the manufacturer. *Stevens v. Rex Chainbelt, Inc.*, 349 So.2d 948 (La.App. 1st Cir. 1977). The *Stevens* case cited as its authority for this statement the case of *Frey v. Travelers Insurance Co.*, 271 So.2d 56 (La.App. 4th Cir. 1972). The *Frey* case does not stand for the statement attributed to it in the *Stevens* case. However, assuming the statement in the *Stevens* case is correct, it stands only for the proposition that the product be in the same condition at the time of the injury as it was when it left possession of the manufacturer. Defendant, in effect, contends that no matter what the growth in the technology of safety features, it is not liable if its product conformed to the state of the art when it lost possession. The evidence in this case is that defendant shipped the saw to its distributor in October of 1975, and the distributor shipped it to the retailer, Smith's Saw Shop, sometimes in 1976. The saw was sold to plaintiff's employer in February, 1977. Defendant exercised some control over its retailers by requiring them to buy the power head, bar and chain. They did not require the retailer to sell the bar and chain with the power head, but allowed the retailer to sell whatever bar and chain the customers wanted. Bulletins were supposed to be sent to the retailers, instructing them on the latest features about the Poulan chain saw. However, some retailers did not receive some of the bulletins.

■ What is reasonable care for a manufacturer of a product he designs must be decided in the light of what was reasonably foreseeable at the time the product's design was put in use. *Guffie v. Erie Strayer Co.*, 350 F.2d 378 (3rd Cir. 1965). The court concludes that the saw was put in use when it left the retailer and came into possession of a user.

■ A manufacturer of a product which involves a risk of injury to a user is liable to any person, who without fault on his part, sustains an injury caused by a design defect, providing the injury might have been reasonably foreseeable or anticipatable. *Leathem v. Moore*, 265 So.2d 270 (La.App. 1st Cir. 1972); *Perez v. Ford Motor Co.*, 497 F.2d 82 (5th Cir. 1974) and *Hastings v. Dis Tran Products*, 389 F.Supp. 1352 (W.D.La. 1975).

In view of the above, let us review what the record reveals the defendant knew in February 1977, particularly about the matter of trying to improve or control kickbacks. Defendant had knowledge that all chain saws will kickback. In the years 1972–1973, Sweden required all imported saws to have a device called a chain brake. Chain brakes were also sold in the United States during these same years.

A chain brake is a spring-like device to stop the chain when there is a kickback. It is installed in front of the handle bar. When there is a kickback, the hand on the handle bar should activate the chain brake by pushing the brake forward and activating it. Dr. Benjamin Shaffer, an expert called by the defendant, who was associated with the chain saw industry from 1957 until 1973, testified that the chain brake was ineffective and gives users a false sense of security, allowing them to get careless. He also said that using the saw in certain positions made the brake ineffective. Various exhibits from magazines of the chain saw industry filed into evidence contradict Dr. Shaffer on these points.

Dr. Shaffer went on to say that professional woodcutters do not want chain brakes because they add weight to the saw and require constant care, maintenance and adjustments. However, he then stated that if a chain brake would have been on Perkins' saw and if properly activated, it might have prevented the accident.

The second safety device that defendant knew about was the safety tip. This tip was first marketed in 1973. It is a device that can be attached to the nose of the bar. Homelite invented it, and McCullough mar-

kets one. This device is designed to prevent the tip of the chain from coming into contact with limbs and rocks. Dr. Shaffer said that the tip guard would have prevented the accident, but that a tip guard was not on the market when this saw was manufactured in 1975. Later he stated the safety tip was in existence with two manufacturers by 1973. One of the complaints about the safety tip is that professional woodcutters would find it undesirable to install and remove the safety tip. The evidence is absolutely clear the tip can be installed or removed in 10–15 seconds.

Dr. Shaffer testified that another complaint is that the tip guard destroys the effectiveness of the saw if the tree is larger in diameter than the length of the bar, because the tip would prevent the bar from cutting the tree. Further, the tip can get tangled with other materials and also get snagged or bind the saw. Despite these drawbacks, the defendant had evaluated tip guards and had filed a patent application before Homelite marketed its tip guard.

Another safety device is a hand guard. Suffice it to say that the question of the hand guard is not an issue in this case and will not be discussed further.

The final safety device is a safety chain which is designed to reduce but does not eliminate kickback. Defendant had a chain available to it called a low profile or safety chain. This chain is manufactured by an Oregon corporation. One of defendant's retailers, Mr. Smith testified that defendant never suggested to him what bar and chain to recommend to his customers to use on the Poulan Powerhead.

One of defendant's engineers, Mr. Gililland, gave reasons why these safety features were not incorporated in their saws. He said the primary concern as to a safety feature is that it must work over 50% of the time. He added that the company adopted the low profile chain as soon as it came on the market. They try to purchase every competitor's model of chain saw that comes on the market to keep up with the state of art, safety features, etc. Mr. Gililland stated that in evaluating safety features, the following factors should be considered:

1. The safety device should be low on maintenance and not depend on operator;

2. The operator must know when and how the safety device is working properly;

3. The operator must know how fast the chain stops with the activation of the chain brake; and

4. There are problems inherent in determining by visual inspection if adjustments are necessary with the chain brake because the saw gets packed with sawdust, dirt, and grease.

Mr. Gililland said Poulan does not put the chain brake on as a standard feature because they feel it is not a safety device. However, he stated the company markets chain brakes as optional equipment.

The defendants contend that the professional woodcutter only looks for good power, light weight, and fast cutting and that a chain brake adds weight, creates maintenance problems, and interferes with the utility of the saw in that it becomes entangled in bushes.

Defendant alleges that the tip guard prevents the full use of the saw because the tip of the saw cannot be used when a tip guard is attached.

Defendant states that the 5200 Poulan saw incorporates the following safety features:

1. weight of saw;

2. placement of handles for balancing;

3. vibration dampened;

4. spark arresting muffler; and

5. solid state ignition.

■ In Louisiana, a manufacturer of a product which involves risk of injury to a user, is liable to any person who without fault on his part, sustains injury caused by a defect in the design, fabrication or manufacture of the article, if the injury might have been reasonably foreseeable or anticipatable. This rule requires the manufacturer to exercise reasonable care in the design of its products which are of such nature that, if not carefully made, can cause foreseeable injury to persons using

the products for purposes which the manufacturer may reasonably expect they will be employed and also to those whom the manufacturer may reasonably expect to be endangered by such probable use. Failure to exercise such care renders the manufacturer liable, if injury results from the lawful use of the product in a manner and for a purpose which the manufacturer may be deemed to reasonably expect. Neither custom nor usage in manufacturing style, nor prolonged marketing and use, without significant injury producing accidents, can exonerate the manufacturer from liability for reasonably foreseeable injuries resulting from the use of its products. *Leathem v. Moore, supra; Perez v. Ford Motor Co., supra.*

■ The burden of proof on the plaintiff in a products liability case is two-tiered. First, he must prove that the manufacturer's product was defective and second that his injuries were caused by the defect. In proving the product defective, the plaintiff must also establish that the product was in normal use. *Perez v. Ford Motor Co., supra.*

■ Applying the foregoing jurisprudence to the facts of this case, it cannot be argued that it was not foreseeable that the saw would cause injury, the type of which defendant may be deemed to reasonably expect. It is true that plaintiff allowed the tip to come in contact with another object but that does not cause him to be at fault. He was using the saw in a manner for which it was designed to be used.

At the time this accident occurred, the chain saw industry had developed numerous safety features to help prevent or reduce chain saw injuries. Defendant was aware of these safety features but did not see fit to make use of them. By its own records, it was shown that some of these features were effective. The defendant took the position that a safety feature had to be more than 50% effective before they would incorporate it in their saw.

■ While it is true that defendant is not an insurer of its products, nevertheless, the law does proscribe that it use reasonable care to avoid undue risk of harm to foreseeable users. *Guffie v. Erie Strayer Co.,* 350 F.2d 378 (3rd Cir. 1965). The court believes that the responsibility of a manufacturer of a product, under the foregoing jurisprudence, is as stated by Dr. Brennan in this case, when he said, in regard to safety features, a manufacturer should do everything it can to engineer hazard out of its product and if it can not, it must warn users of the hazards.

Defendant contends that Louisiana law does not require a manufacturer to impair the utility of its product. In *Albert v. J and L Engineering Co., Inc., et al.,* 214 So.2d 212 (La.App.1968), the court stated:

It would be ridiculous to require a manufacturer in the name of safety to destroy the usefulness of his machine and his failure to render its inoperable cannot be termed negligence.

■ This court has no quarrel with the law. However, the safety devices known and available to the defendant, were being marketed by its competitors. In fact, defendant was required to attach and did attach chain brakes on all its saws exported to Sweden. Additionally, it offered this same chain brake as optional equipment on its saws in the United States. For defendant to say this safety feature destroys the usefulness of its saw contradicts its own action.

■ It is contended that a product is not in normal use if it is improperly used. Defendant contends that plaintiff was not using the saw properly when he was injured. In support of this contention, defendant cites its manual which states:

[a]ccidental contact with the nose section of the bar while cutting may cause a dangerous kickback.

By the very fact of the above statement, defendant recognizes that in normal use a saw's bar may come in contact with objects which may cause kickback. This acknowledges that accidental contact is possible in normal use.

Finally, defendant contends that plaintiff assumed the risk of his injury because he was an experienced woodcutter, knew ex-

actly how his 5200 Poulan chain saw was equipped, and that chain saws would kickback.

Assumption of the risk is a defense to an action in strict liability. However, it is narrowly restricted by two requirements: first, the plaintiff must know and understand the risk he is incurring, and second, his choice must be free and voluntary. *Wilson v. Voss,* 361 So.2d 312 (La.App. 1st Cir. 1978).

■ Knowledge is one of the mainstays of the first requirement of the defense of the assumption of the risk, and it must be proved by a preponderance of the evidence. *Prestenbach v. Sentry,* 340 So.2d 1331 (La. 1977). We know that plaintiff was aware that a chain saw would kickback. But did he have full knowledge of the risk? He had occasioned two previous episodes with kickback, but never of the magnitude that occurred in this case. To say that he had full knowledge and that he voluntarily assumed the risk would be tantamount to the plaintiff knowingly and voluntarily assuming the risk of serious injury.

In *Prestenbach, supra,* the court stated:

[F]or purposes of a knowing assumption of risk, we impute knowledge to a plaintiff, not because he was in a position to make certain observations, but only when he actually makes those observations and, from them, should reasonably have known that a risk was involved.

■ The plaintiff was using the chain saw in a normal manner. While aware that chain saws kickback, he did not knowingly encounter the risk of the kickback he experienced in his use of the chain saw on March 30, 1978. The defendants have failed to prove that plaintiff should have known of the condition he was encountering. La.C. Civ.P. Art. 1005; *McInnis v. Fireman's Fund Insurance Co.,* 322 So.2d 155 (La. 1975).

Having determined that defendant is liable to plaintiff, the court must determine the amount of the award.

The plaintiff was 39 years old at the time of the accident and has an eighth grade education. He started as a woodcutter at the age of 16 and continued in that field until his injury on March 30, 1978.

Mr. Perkins, as a result of the accident, received an extensive laceration on the back of his forearm and a cut on his right forearm, which included the cutting of a lot of muscles and tendons and a fracture of one of the bones in his arm.

He was in the hospital from March 30, 1978 to April 15, 1978, followed with office visits to his doctor. On May 2, 1978, he reentered the hospital and was put to sleep and the joints of his hand were manipulated for the purpose of getting some movement in his hand. He had 3 or 4 nerve blocks to diminish the pain in the hand to enable Mr. Perkins to attempt to get more movement. He was given physical therapy and finally discharged on June 14, 1978. Subsequently, on September 22, 1978, the doctors operated on his hand to release the collateral ligaments to make his hand more functional. The doctor who operated on plaintiff's hand, examined it on the day of the trial, and found it cold and clammy. Plaintiff did have more flexion in the joints. This doctor felt that plaintiff's injury impaired him as a laborer for the rest of his life and while his hand may improve, it will not do so significantly. Mr. Perkins can not climb a ladder and he should only drive a vehicle with an automatic transmission.

On November 16, 1978, the original treating physician again put Mr. Perkins in the hospital and performed an open reduction and bone graft of the forearm. This was done by removing a piece of bone from the crest of the pelvis and placing it in the cavity of the arm where bone had been removed by the chain saw. This bone graft was successful.

Plaintiff testified that he continues to have pain from his right shoulder down the entire right arm. He is left handed. He is able to mow his grass but cannot pick up anything with his right arm because he has no strength in his hand. He appeared to be a depressed man because of his inability to do the things he did before the accident. He can not hunt and fish anymore, nor has he worked since the accident.

For four years prior to the accident, 1974, 1975, 1976 and 1977, Mr. Perkins earned $10,345.40, $13,412.65, $12,661.66 and $12,730.85, respectively. Thus, Mr. Perkins averaged $12,287.00 a year for the four years prior to the accident. Plaintiff has sustained actual loss of wages through the date of trial in the sum of $16,709.00 based on 16⅓ months from date of injury to date of trial.

The more serious question is plaintiff's loss of future earnings. The court takes judicial notice that the United States Department of Labor statistics for working life males for the period 1900–1960 shows Mr. Perkins has a work life expectancy of 24.1 years. *Commissioner of Internal Revenue v. Meyer*, 139 F.2d 256 (6th Cir. 1943). If Mr. Perkins is not able to return to any kind of work, he would be entitled to future loss of earnings for the 24 years. The preponderance of the evidence is that Mr. Perkins will not be able to resume his occupation as a woodcutter. The evidence is that Mr. Perkins could perform work which does not require heavy lifting. The problem here is that he has an eighth grade education with training only as a woodcutter. It would appear that plaintiff can be rehabilitated in some type of work. However, if plaintiff is unable to secure gainful employment for the rest of his work life, his future loss of earnings would amount to $296,117.00 based on his present salary. This figure must be discounted to present value to offset the investment credit. The court finds a discount rate of 7% to be appropriate. This rate will yield a lump sum of $141,157.00, which if invested at 7% interest will enable plaintiff to withdraw $12,287 annually for the next 24 years. However, this figure does not take into account the normal raises one would expect to earn over his working life. For this reason, the court believes that an award of future loss of earnings in the sum of $175,000.00 is justified.

The last item of damages concerns Mr. Perkins' physical and mental pain and suffering and disfigurement. The evidence is that Mr. Perkins has suffered and will continue to suffer in the future. He certainly has a disfigurement which is permanent. He has also suffered the mental anguish of not being able to care for his family as he has done in the past. This will not change. The court notes, of course, that no amount of money can really compensate Mr. Perkins for his tragic injuries, but believes that an award of $75,000.00 is certainly justified for the pain and suffering and disfigurement.

Plaintiff's employer, Boise Southern Company, intervened in this suit, seeking to recover the medical expenses it incurred as a result of plaintiff's injuries. The evidence establishes that medical expenses of $12,495.30 were incurred by plaintiff and paid for by intervenor. Certainly, Mr. Perkins is entitled to recover this sum from defendant. Intervenor is entitled to recover this sum out of the award to the plaintiff. In addition, Intervenor has paid plaintiff $9,620.00 as workmen's compensation. It is entitled to recover this sum out of the sum awarded to plaintiff. Intervenor has continued to pay compensation to plaintiff at the rate of $130.00 per week.

## FINDINGS OF FACT

1. Plaintiff Tom Perkins is a citizen of the State of Louisiana and is domiciled in Beauregard Parish. Defendant Emerson Electric Company is a Missouri Corporation with its principal place of business in Missouri. It is authorized to and is doing business in the State of Louisiana.

2. The matter in controversy exceeds $10,000.00 exclusive of costs and interest.

3. Plaintiff, age 39 at the time of the accident, was injured as a result of a chain saw accident on March 30, 1978, while employed by Boise Southern Company as a woodcutter. In the years 1974–1977, he earned an average annual wage of $12,287.00.

4. At the time of the accident plaintiff was using a 5200 Poulan chain saw manufactured by defendant and furnished to him by his employer.

5. The accident happened as a result of the nose of the revolving chain contacting an unexpected object, resulting in a "kick-

back." Plaintiff was unable to control the saw and as a result sustained serious injuries to his right forearm. At the time, he was using the saw in a normal manner and could not anticipate the sudden kickback.

6. A chain saw is an inherently dangerous tool, in that the hazards of "kickback" had resulted in hundreds of injuries prior to the date the particular chain saw was purchased by Boise Southern Company for use by plaintiff in February, 1977. The statistics of these injuries and their "kickback" origination was well known by defendant for several years prior to its design of the model 5200. This fact was generally known to the chain saw industry.

7. For at least two years prior to the sale of the saw to Boise Southern Company and its manufacture, defendant was aware of devices on the market which were available without unreasonable cost or unusual production problems, and which were intended to prevent, or at least reduce, the dangers of kickback.

8. Many chain saw manufacturers offered safety devices, such as a hand guard, chain brakes and tip guards, as standard or optional equipment. These safety devices were intended to make the user less vulnerable to injuries from kickback.

9. The defendant did very little, if anything, towards either adopting the available designs, or warning the ultimate user of their availability. They failed to adequately warn of the fact that the 5200 model saw would not be controllable in all kickback situations, nor that at some time, despite the exercise of caution, that kickback would occur.

10. Plaintiff did not have effective knowledge of the hazards of kickback, and the danger was not obvious to him, nor was the danger appreciated. He could not know that despite his diligence, that at some unexpected time, the saw would kickback and he would not be able to control it.

11. The proximate cause of the injury was the chain saw, in that it did not have any devices to prevent the hazard. The saw was defectively designed. The danger was unreasonable considering that other manufacturers had taken steps to eliminate the hazard. The injury to plaintiff was foreseeable, in the light of the expertise of the defendant and the information known by it. The saw was being used in a normal way at the time of the injury.

12. Considering the frequency of injuries, available alternative designs, feasibility of adopting alternative designs, as well as the limited cost factor, the magnitude of the risk outweighed the utility of the product as sold by this defendant, and therefore its actions were unreasonable.

13. Defendant had the knowledge of how to prevent, or at least reduce the potential harm from the inherent danger of kickback, as well as, having a hand guard, safety-chain, and a chain brake, of its own design, yet it failed to make these facts known in an effective manner.

14. Defendant had no system of keeping its retailers or consumers informed of advances in design or modification of its saws or warnings of dangers in the use of the saw.

15. The use of a tip guard would have prevented the kickback. The use of a chain brake, while not preventing the kickback, would have probably prevented the injury or greatly minimized it.

16. The adoption of any of the safety devices, referred to above, would not have materially affected the marketability and utility of its product, and defendants failure to adopt them was unreasonable.

17. Boise Southern Company has paid medical expenses of $12,495.30 and workmen's compensation of $9,620.00 through September 24, 1979. It has continued to make compensation payments to plaintiff at the rate of $130.00 per week.

## CONCLUSIONS OF LAW

1. This court has jurisdiction under 28 U.S.C.A. § 1332.

2. In Louisiana, a manufacturer is held to strict liability, without regards to negligence. *Khoder v. AMF, Inc.*, 539 F.2d 1078 (5th Cir. 1976).

3. A manufacturer of a product which involves a risk of injury to a user, is liable to any person, who without fault on his part, sustains an injury caused by a design defect, or in the fabrication or manufacture of the article, if the injury might have been reasonably foreseeable or anticipated. *Leathem v. Moore*, 265 So.2d 270 (La.App. 1st Cir. 1972).

4. Failure to exercise reasonable care in the design and manufacture of a product renders the manufacturer liable, if the injury results from the lawful use of the product and in a manner and for the purpose intended. *Leathem v. Moore, supra.*

5. While a manufacturer is not an insurer of its products, nevertheless, it must use reasonable care to avoid creating an undue risk of harm to foreseeable users. Reasonable care must then be determined in the light of what is reasonably known by the manufacturer at the time the design is put into use, and the manufacturer is held to the standard of an expert in regards to its own product. *Guffie v. Erie Strayer Co.*, 350 F.2d 378 (3rd Cir. 1965).

6. A product is defective and unreasonably dangerous when a reasonable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect. *Welch v. Outboard Marine Corporation*, 481 F.2d 252 (5th Cir. 1973).

7. In Louisiana in cases of this type, plaintiff does not have to prove negligence, but must show: (1) Proximate cause; (2) an unreasonably dangerous condition; (3) that the injury might have been reasonably anticipated by the manufacturer; and (4) normal usage. *Reeves v. Great Atlantic & Pacific Tea Co.*, 370 So.2d 202 (La.App. 3rd Cir. 1979); *Welch v. Outboard Marine Corporation, supra; Weber v. Fidelity & Casualty Insurance Co. of N. Y.*, 259 La. 599, 250 So.2d 754 (1971); *Hastings v. Dis Tran Products, Inc.*, 389 F.Supp. 1352 (W.D.La. 1975).

8. To assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm. The person must understand and appreciate the risk involved. He must accept this risk, as well as the inherent possibility of danger because of the risk. The burden of proving this defense rests upon the defendant. *McInnis v. Fireman's Fund Insurance Co.*, 322 So.2d 155 (La. 1975).

9. Plaintiff sustained loss of past earnings of $16,709.00. In addition, he has a future loss of earnings in the sum of $175,000.00. Plaintiff has sustained damages of $75,000.00 for physical and mental pain and suffering and disfigurement.

10. Plaintiff had medical expenses of $12,495.30 which were advanced by his employer, Boise Southern Company.

11. Boise Southern Company paid weekly compensation to plaintiff up to date of this trial the sum of $9,620.00. Boise Southern has continued to pay weekly compensation to plaintiff in the sum of $130.00 per week.

12. Boise Southern Company is entitled to be paid in preference and priority out of the sum awarded to plaintiff, all medical expenses and workmen's compensation paid on behalf of or to plaintiff. La.R.S. 23:1103; *Lachney v. Motor Parts and Bearing Supply, Inc.*, 357 So.2d 1277 (La.App. 3rd Cir. 1978).