643 So.2d 807 (1994)
Jeanette DELERY
v.
The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Ayrshire Corporation Louisiana, RefcoPoydras Offices, Inc., Ayrshire Corporation, Inc., Lasalle Properties, Inc., Drumm and Associates, Inc., dba Ayrshire Land Dome Joint Venture.
No. 94-CA-0352.
Court of Appeal of Louisiana, Fourth Circuit.
September 29, 1994.
*810 Glenn C. McGovern, New Orleans, for plaintiff/appellant.
Emery N. Voorhies, Ward & Clesi, Covington, for defendants/appellants Ayrshire Land Dome Joint Venture and North River Ins. Co.
Charles A. Boggs, Terry B. Deffes, Boggs, Loehn & Rodrigue, New Orleans, for defendant/appellee Steelcase, Inc.
Before BARRY, LOBRANO and WARD, JJ.
LOBRANO, Judge.
Plaintiff, Jeanette Delery, a paralegal, filed the instant suit seeking damages for injuries she received as a result of a fall from an office chair in May, 1986. She sued the manufacturer of the chair, Steelcase, Inc. and the owner of the building where she worked, Ayrshire Land Dome Joint Venture (Ayrshire). After a judge trial, Steelcase was dismissed, judgment in the amount of $355,025.98, plus interest and costs was rendered in plaintiff's favor, and fault was apportioned at 10% to Ayrshire, 30% to plaintiff and 60% to plaintiff's employer, the law firm of O'Neil, Eichin, Miller and Breckenridge (O'Neil & Eichin). Citing the rule of Gauthier v. O'Brien, 618 So.2d 825 (La.1993), the trial judge reallocated the employer's fault between plaintiff and Ayrshire.[1]
Both Ayrshire and plaintiff perfect appeals. Ayrshire argues the following errors:
1) The assessment of fault against Ayrshire was manifestly erroneous.
2) The award of damages is too high.
3) The trial court erred in reallocating the employer's fault which raised Ayrshire from 10% to 25%.
Plaintiff argues the following five errors:

*811 1) The court erred in assessing any fault against plaintiff.
2) In the absence of any allegations of employer fault, it was error to attribute any fault to the employer.
3) The fault assessed Ayrshire was erroneous and should be increased.
4) The dismissal of Steelcase, the manufacturer, was erroneous.
5) The assessment of damages was manifestly too low.
After review of the various errors briefed and argued by each party, we consolidate the issues to be resolved into the following:
a) Whether the court's assessment of fault among the various parties, as well as the dismissal of Steelcase, is supported by the record and not manifestly erroneous.
b) Whether the employer's fault should have been quantified and whether reallocating same violates the "virile share" rule of Civil Code Article 2324.
c) Whether the damages are manifestly too high or too low.
According to plaintiff, this unwitnessed accident occurred in May 1986 while she was working as a paralegal at the O'Neil & Eichin law firm. She had only begun working at the law firm two weeks prior to the accident. Plaintiff was seated at her desk in a chair which had a plexiglass mat underneath it. She backed her chair away from the desk to get up, turned the chair to the left and stood up. As she was doing so, the chair flipped, hitting her in the back of the neck and causing her to fall to the ground and land on her buttocks. Plaintiff claims that her chair flipped over in the same manner in July 1986 but that she maintained her balance and avoided falling that time. The chair on which plaintiff was seated was manufactured by Steelcase and had hard steel casters on its legs. The casters were designed for use on carpeted floors. A warning placed on the underside of the chair advised the user that use on hard surfaces affects the chair's stability.
The thrust of plaintiff's claims against Ayrshire is a defect in the floor of the building where the accident occurred and against Steelcase for failure to warn. Our first issue for consideration is whether the trial court's assessment of fault among the various parties, as well as the dismissal of Steelcase, is supported by the record and not manifestly erroneous.
The factual findings of a trial court will not be disturbed in the absence of manifest error or unless clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). If a trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently had it been the trier of fact. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990). However, even though deference to the factfinder should be accorded, an appellate court has a constitutional duty to review facts and has every right to determine whether the trial court judgment was clearly wrong based on the evidence or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-C-3099, 93-C-3110, 93-C-3112, (La. 7/5/94); 639 So.2d 216 (La.1994).

AYRSHIRE
Ayrshire Land Dome Joint Venture, the owner of the office building at the time of the accident, and its insurer, North River Insurance Company, were assessed 10% of the fault for plaintiff's accident. The fault of these defendants is based on the trial court's finding that the slope in the floor of plaintiff's office was a cause of the accident.
It is undisputed that there was a slope in the floor of the office used by plaintiff. However, the expert testimony conflicted as to whether or not the slope constituted a defect that could have contributed to plaintiff's accident.
Lawrence Reed, an expert in architecture, inspected the plaintiff's former office on March 17, 1988. He pulled up the carpeting in the office and measured the concrete floor. Reed found that the floor, which measured twelve feet from the exterior wall to the corridor wall, had a downslope of one and five-eighths inches. Reed noted that this slope exceeded the maximum deviation tolerance *812 listed in the building specifications which are three-eighths inches per eight feet and a total maximum deviation tolerance of one inch in forty feet. In Reed's opinion, this slope in the floor constituted a hidden defect.
Jay Hotard, a general contractor, accompanied Lawrence Reed to the site inspection of plaintiff's office. Hotard agreed with Reed's findings.
Frank Griffith, the physics expert called by the plaintiff, testified that, in his opinion, the combination of the slope in the floor and the smooth surface underneath the chair could cause the chair to move unexpectedly.
Lenny Quick, an expert in the field of civil structural engineering with a subspecialty in concrete, conducted an inspection of plaintiff's office and found that the floor slab met New Orleans Building Code standards and American Concrete Institute Manual of Concrete Practice standards. Quick agreed with the plaintiff's experts that there was a slope in the office floor but his opinion was that this slope did not constitute a defect. In fact, Quick stated that such a slope is anticipated and expected in high rise buildings due to differential settlement and loading conditions.
In order to establish liability on the part of a defendant under Civil Code Article 2317, the plaintiff must prove that: 1) the thing which caused damages was in the care and custody of the defendant, 2) the thing had a vice or defect which created an unreasonable risk of harm, and 3) the injuries were caused by the defect. Loescher v. Parr, 324 So.2d 441 (La.1975). In this case, the evidence supports the trial court's finding that the slope in the floor constituted a defect which created an unreasonable risk of harm and was a contributing cause of the accident. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is more credible. Sistler v. Liberty Mutual Insurance Company, supra. We cannot say that the trial court's assessment of 10% fault to Ayrshire is clearly wrong.

JEANETTE DELERY
Jeanette Delery, was assigned 30% of the fault because of her failure to read the warning on the chair. Plaintiff argues that finding her negligent and that her negligence was a cause of her accident is manifestly erroneous and should be reversed.
Plaintiff claims that she did not see the warning underneath the chair and would not have used the plexiglass mat if she had seen the warning. To support her assertion, plaintiff offered the testimony of several current and former employees of the O'Neil & Eichin law firm who also stated that they never saw the warning label under the chair. Plaintiff also cites the testimony of Steelcase engineer Bruce Preston who stated that a person who uses one of these chairs typically would not see the warning label. Plaintiff's uncontradicted testimony was that she did not see the sales brochure nor any other literature regarding use of the chair during her employment at O'Neil & Eichin. Additionally, the evidence shows that the plexiglass mat was placed in plaintiff's office before she started working at the law firm.
We conclude that the assessment of 30% fault to the plaintiff was manifestly erroneous. Plaintiff was using the facilities (desk, chair, etc.) provided by her employer. She had only been employed two weeks prior to the accident. To assign any fault to her for failing to look under her chair for a warning would be error. The fault, in our opinion, lies with Steelcase for failing to properly warn the normal user about the danger inherent with the use of steel casters on a hard surface. We now discuss their fault.

STEELCASE
Steelcase, the manufacturer of the chair from which plaintiff fell, was dismissed from plaintiff's lawsuit after trial. The plaintiff argues that the trial judge erred in not finding Steelcase at fault. Specifically, plaintiff claims that the chair was defectively designed and contained an inadequate warning.
Under the law in effect at the time of this accident,[2] to prevail under a products *813 liability theory of recovery, a plaintiff had to prove that the harm complained of resulted from the allegedly defective condition of the product, that the condition made the product unreasonably dangerous for normal use, and that the condition existed at the time the product left the manufacturer's control. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Boh Brothers Construction Company, Inc. v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4th Cir.1992), writ denied, 614 So.2d 1256 (La.1993); Goins v. Galion Manufacturing Co., 626 So.2d 1200 (La.App. 3rd Cir.1993), writ denied, 93-2888 (La. 1/28/94); 630 So.2d 792 (La.1994).

a) Defective Design:

Plaintiff presented the testimony of O. Frank Griffith who holds a Ph.D. in physics and was qualified as an expert in that field. Griffith examined the chair used by plaintiff, Steelcase model # 43311, and conducted tests to determine its stability. Griffith stated that, although the chair met the forward stability standards established by the American National Standards Institute (ANSI), those standards are only minimum and that compliance with those standards alone will not ensure a chair's stability.
Griffith testified that he tested the chair in the least stable circumstances possible in order to take into account the slope in the floor and the smooth plexiglass carpet shield under the chair. He loaded the chair with varying amounts of dead weight and pushed down on the right corner of the chair to determine the point at which the chair would tip over in different circumstances. Griffith concluded that this chair was unstable. His opinion was that the instability of the chair was caused in part by insufficient length of the chair legs.
On cross-examination, Griffith admitted that if plaintiff was sitting in the chair with her weight in the center of and her back against the back of the chair, it would be stable. He also stated that he did not inspect the office in which the accident allegedly occurred.
The defense offered the testimony of Bruce Preston, a Steelcase employee who was qualified as an expert in the field of mechanical engineering. Preston testified that Steelcase chair model # 43311 has been manufactured since 1973 with sales of 10,000 chairs annually. In that time, no complaints have been made as to its stability. He inspected the chair at the office where the accident occurred and found that it exceeded the stability requirements of the ANSI by forty percent. He performed tests using a computer simulation which put the chair at its most unstable position with a person sitting in it who was similar in height and weight to the plaintiff. His opinion was that the chair would not overturn if a person was sitting in it in the way described by the plaintiff.
When questioned about Dr. Griffith's method of testing for stability by applying weight to a corner of the chair, Preston explained that this method of testing on the Steelcase 43311 chair will not provide accurate results because the arms of that chair prevent a person from sitting with his or her weight concentrated on the corner of the chair.
Although the trial judge did not state his reasons for dismissing plaintiff's claim against Steelcase, the record provides sufficient evidence to support the conclusion that the Steelcase chair model # 43311 was not defectively designed.

b) Failure to Warn:

Plaintiff also argues that Steelcase is liable for failure to warn. Even though a product is not defective, a manufacturer has a duty to instruct reasonably foreseeable users of its product with regard to its safe use. Sawyer v. Niagara Machine and Tool Works, Inc., 535 So.2d 1057 (La.App. 2nd Cir.1988), writ denied, 536 So.2d 1222 (La. 1989). In Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La.App. 4th Cir.1992), writ denied, 604 So.2d 1315 and 1318 (La. 1992), this court stated:

*814 "A manufacturer must anticipate foreseeable misuse and also consider the particular hazard. When a product presents a serious risk of harm, the manufacturer must warn in a manner likely to catch the user's attention."
It is undisputed that a warning label was permanently attached to the bottom of the chair. This label stated: WARNINGUSE HARD WHEEL CASTERS ONLY ON CARPETED SURFACES. USE ON HARD SURFACES WILL AFFECT CHAIR STABILITY. Plaintiff argues that this warning was inadequate because its placement on the bottom of the chair made it unlikely that the warning would be seen by a user of the chair. In fact, plaintiff and several other current and former employees of the O'Neil & Eichin law firm testified that they never saw the warning label on this chair. Even Steelcase engineer Bruce Preston stated that a person who uses one of these chairs typically would not see the warning label.
Preston testified that the warning label on this chair model was placed on the bottom of the chair because it was intended to be permanently attached to the chair and Steelcase management felt that a label placed on the back of the chair or in another more visible area would be torn off or defaced. He explained that Steelcase had previously placed warning labels in a noticeable area on file cabinets and customers complained that they wanted the labels removed because they were unsightly.
Steelcase argues that it had no duty to warn but did so voluntarily even though the company had never received any complaints of hazards associated with the chair. According to Preston, the warning was added only because Steelcase began offering a model of the chair featuring hard wheel casters for use on carpeting, in addition to its traditional model featuring soft wheel casters.
Although a warning label was placed underneath the chair, Steelcase did not include a warning in its sales brochure accompanying the chair or on the box in which the chair was shipped. A section of the sales brochure does state that the chair model featuring hard wheel casters is intended for use on carpeted surfaces but this information is not phrased as a warning.
We conclude that the trial court was clearly wrong in finding no liability on the part of Steelcase. We find that Steelcase had a duty to warn and failed to adequately do so. The use of plexiglass carpet shields under office chairs was a foreseeable use of this product. Steelcase's warning not to use this chair on a hard surface was not adequately communicated to reasonably foreseeable users. The evidence is uncontradicted as to the fact that the warning underneath the chair was not likely to be seen by a normal user. Furthermore, the sales brochure which indicated that this chair was to be used on carpeted surfaces was supplied to purchasers of the chair but there is no evidence that the manufacturer instructed the purchaser to forward this brochure to the ultimate user of the chair.
An essential element of a plaintiff's cause of action for failure to warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). Plaintiff's uncontradicted testimony was that if she had seen the warning, she would not have used the chair on top of the plexiglass mat. We hold that Steelcase's failure to adequately warn plaintiff of this danger was a cause of the accident because the combination of the use of the smooth plexiglass mat and the slope in the floor of plaintiff's office caused this chair to become unstable. Steelcase was aware of this danger as indicated by the wording of its own warning yet it failed to adequately relay this information to chair users.
Accordingly, the 30% of fault erroneously assessed to plaintiff is assessed to Steelcase.

O'NEIL & EICHIN
Plaintiff's employer at the time of the alleged accident, O'Neil & Eichin, was assigned 60% of the fault for this accident. The trial judge reasoned that the employer was at fault because its employees furnished plaintiff's office with a smooth plexiglass mat placed underneath the Steelcase chair despite *815 the statement in the brochure which clearly stated that the chair model featuring hard wheel casters was to be used on carpeted surfaces. Plaintiff's employer owed her a duty to provide a safe work environment. That duty was breached.
Even though we find sufficient evidence to support the trial court's assessment of 60% fault to plaintiff's employer, it was error to quantify employer fault. The effect of that error is discussed below.

QUANTIFICATION OF EMPLOYER FAULT:
The court initially quantified the employer's fault at 60%. In an amended judgment rendered a week after the initial judgment, the trial court reallocated the employer's fault according to the Gauthier, supra, rule.[3] In accordance with Gauthier's holding, the 60% employer fault was assessed at 45% to plaintiff and 15% to Ayrshire, i.e. a 3 to 1 ratio.[4]
Ironically, both Ayrshire and plaintiff argue that the quantification of employer fault by the trial court was error. Plaintiff asserts that there should be no quantification of the employer's fault since neither Ayrshire nor Steelcase plead that affirmative defense and because there was no evidence of employer fault. Thus says the plaintiff, Ayrshire and Steelcase should bear the entire burden of the fault attributed to the employer.
Ayrshire, on the other hand, argues that quantification and reallocation of employer fault was erroneous because the accident occurred prior to the 1987 amendment to Civil Code Article 2324, and the interpretative law at that time held that employer fault should not be considered, citing Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991) and Melton v. General Electric Company, Inc., 579 So.2d 448 (La.1991). By quantifying employer fault and then reallocating it, Ayrshire argues that the "virile share" rule of Article 2324 is violated.[5]
Louisiana's comparative fault system had its origin in 1979 (Act No. 431) with the amendments to Civil Code Articles 2323 and 2324. A plaintiff's contributory negligence would not defeat his claim for damages, only reduce it in accordance with his proportion of fault. La.C.C.Art. 2323. The rule of solidary obligations by those whose concurring fault caused damages was maintained, with the exception that "a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed...." La.C.C.Art. 2324. This is the virile share rule to which Ayrshire refers. In 1983, Code of Civil Procedure Article 1812 was also amended to provide that a trial court may submit interrogatories to the jury concerning any person's fault, whether a party or not. In Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984), the Supreme Court recognized that with the adoption of a comparative fault scheme, the fault or non fault of all persons was relevant to the determination of damages to which a plaintiff was entitled. Code of Civil Procedure Article 1812(C)(2) was the procedural mechanism to accomplish this determination.
In 1987, Civil Code Article 2324 was again amended. The amendment provided that the liability of concurring tortfeasors would be "solidary only to the extent necessary for the person suffering injury, death or loss to recover fifty percent of his recoverable damages...." The article retained the "virile share" rule that a debtor whose fault was less than that of a plaintiff would not be liable for more than his degree of fault. The amendment, however, prohibited solidary responsibility between joint tortfeasors "regardless of such other person's insolvency, ability to pay, degree of fault or immunity by *816 statute or otherwise." La.C.C.Art. 2324(B).[6] (emphasis added)
In two cases involving accidents occurring prior to the 1987 amendment, our Supreme Court held that it was error to assess employer fault in a third party tort suit. Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991); Melton v. General Electric Company, Inc., 579 So.2d 448 (La.1991). Arguably, the legal conclusion in Melton that it is error to consider employer fault, is dicta since there was no evidence to suggest employer fault. However, in Guidry, there was evidence to substantiate fault on the employer's part and the court held that the trial court erred in considering it. Rather than disregarding the employer's fault the solution fashioned by the court was to apportion it between the plaintiff and the tortfeasor in proportion to their fault ratio. The plaintiff was 10% negligent, the tortfeasor 70%, therefore the employer's fault was apportioned at a one to seven ratio.
The holdings in Melton and Guidry were predicated on the lack of an express legislative directive on the issue of employer fault. In both cases the court did not find that legislative intent in Code of Civil Procedure Article 1812(C)(2).
In Gauthier v. O'Brien, supra, the accident occurred subsequent to the 1987 amendment to Article 2324. Relying on that amendment, the Supreme Court reversed its previous holdings in Melton and Guidry and concluded that "the assessment of employer fault is made mandatory by the 1987 amendment to La.Civil Code Art. 2324 B...." Gauthier, supra at 831. The persuasive language cited by the court was the last sentence which provides that a joint tortfeasor "shall not be solidarily liable with any other person ... regardless of such other person's ... immunity by statute or otherwise." This sentence, the court concluded, clearly suggests that fault should be allocated to immune employers. Id. at 831. Ironically though, the result in Gauthier is the same as Guidry. The ratio formula utilized in Guidry was utilized in Gauthier to apportion the employer fault between plaintiff and the third party tortfeasor.
We initially conclude that the Gauthier holding should not be applied retroactively. It's reasoning is based on the 1987 amendments to Article 2324 which are substantive changes in the law and are to be applied prospectively. La.C.C.Art. 6; See also Morrison v. J.A. Jones Construction Company, Inc., 537 So.2d 360 (La.App. 4th Cir.1988). Thus, the quantification of employer fault was error. However, as the Supreme Court did in Guidry, supra and because we have concluded that the evidence does support employer fault, we reallocate the employer's fault. Ayrshire is 10% at fault and Steelcase is 30% at fault. The employer's fault of 60% is apportioned on a 1 to 3 ratio. Therefore Ayrshire is cast with 25% of the fault and Steelcase with 75%.[7] Because the plaintiff has no fault, Ayrshire's argument that the "virile share" rule of Article 2324 is violated is moot.
Finally, Delery advances the argument that employer fault should not have been submitted to the judge because it was not pleaded by anyone as an affirmative defense. We disagree. Code of Civil Procedure Article 1154 allows amendment to pleadings to conform to the evidence. As we previously noted, there was sufficient evidence presented regarding employer fault to support the trial court's findings. The failure to actually amend the pleading does not affect the result of the trial of the issue. La.C.C.Pro.Art. 1154. Furthermore, Code of Civil Procedure Article 1812(C)(2) mandates the consideration of the fault of any person, whether party or not, where evidence of such person's fault is submitted.

*817 DAMAGES

The final issue to be addressed is damages. Plaintiff was awarded the following: $110,000.00 in general damages, $20,025.98 in past medical expenses, $75,000.00 in past lost wages and $150,000.00 in future lost wages for a total of $355,025.98 plus expert fees, legal interest from date of judicial demand and court costs. Defendant Ayrshire and its insurer argue that the damages awarded are excessive and should be reduced. Plaintiff argues that her award was inadequate and should be increased.
At trial, plaintiff claimed that she did not have immediate pain after the May 1986 accident but gradually began to experience headaches and soreness in her shoulders and legs. One day in September 1986, plaintiff's arms began to tingle and she felt a burning sensation in both arms. At that point, she contacted Dr. Robert Ruel, an orthopedic surgeon. Dr. Ruel eventually consulted with Dr. Bert Bratton, a neurosurgeon. Both physicians treated plaintiff and their testimony is summarized later in this opinion.
In June 1987, plaintiff was involved in an automobile accident. She suffered a scalp laceration and received stitches. She also felt soreness in her hip area. Plaintiff claimed that this accident increased the pain throughout her body. Dr. Bratton performed anterior cervical diskectomy fusion surgery on her in May 1988. Plaintiff claimed that her condition did not improve very much after the surgery and she complained that she was still having numbness in her hands and arms and pain in her neck and legs at the time of trial. Plaintiff claimed that September 25, 1986 was the last day that she was able to go to her office due to her pain. She was terminated from her employment at O'Neil & Eichin on October 30, 1986.
Plaintiff stated that before the chair accident, she engaged in many recreational activities including tennis, bowling and bicycling. Since the accident, plaintiff claims that she has been unable to participate in these activities. She stated that she has had to rely on her mother for financial support since the accident because the pain from her injuries has prevented her from working.
Dr. Robert Ruel, an orthopedic surgeon, testified that plaintiff visited his office on September 25, 1986 complaining of pain in her neck, shoulder and feet, a tingling sensation in her arms and hands, headaches and nervous symptoms. He suspected a thoracic outlet problem but nerve studies performed showed normal results. He saw her again two weeks later and her complaints of pain continued. On plaintiff's third visit to Dr. Ruel on October 14, 1986, plaintiff mentioned to him for the first time that she had fallen from a chair at her job several months earlier. Dr. Ruel ordered a CT scan and MRI of her cervical spine. These tests were interpreted by Dr. Daniel Johnson who found that the tests indicated a herniated disc at C4-5 and a broad based disc at C5-6. In November 1986, plaintiff was hospitalized for more diagnostic tests including a total spine myelogram and another CT scan. The myelogram showed a minimal bulge at C4-5 and C5-6 and mild disc bulges in the lumbar area at L3-4 and L4-5. The CT scan of the cervical area showed a moderate sized central disc at C4-5 and nothing noteworthy at C5-6.
At that point, Dr. Ruel consulted with Dr. Bratton. They both agreed that plaintiff should continue being treated conservatively. They also both thought that plaintiff was having psychological problems which were contributing to her condition. Plaintiff's complaints of neck and arm pain continued through February 1987. Dr. Ruel next saw plaintiff on June 19, 1987, five days after her automobile accident in which she received a large laceration on her forehead and was briefly hospitalized. Plaintiff told Dr. Ruel that she lost consciousness when she received her head injury and complained of total body soreness including hip, back and shoulder pain.
Plaintiff visited Dr. Ruel several times over the next few months consistently complaining of neck, arm and back pain. She complained of depression and Dr. Ruel recommended that she receive a psychological evaluation and treatment. In May 1988, Dr. Bratton performed a diskectomy at C4-5 and C5-6 with interbody fusion from a bone graft *818 from the pelvic area. Dr. Ruel explained that he does not perform neck surgery so he consulted Dr. Bratton.
Dr. Ruel saw plaintiff again on June 20, 1988 following her surgery. She told him that her condition had not improved and she was having pain at the donor graft site of the left hip and continued discomfort when seated. Dr. Ruel again recommended that plaintiff seek psychiatric care.
Although x-rays showed that plaintiff's surgery was successful, she continued to complain of back and shoulder pain, restricted neck motion and numbness in her arms. Plaintiff was receiving psychiatric treatment and anti-depressant medication as well as pain medication. Because of continued complaints, Dr. Ruel ordered another EMG study on August 10, 1989. The results were normal. Dr. Ruel saw plaintiff on two more occasions in 1989 during which she had complaints of spasms in her shoulder, neck and back, headaches and nerve irritation in her hands. The last time Dr. Ruel saw plaintiff was on November 19, 1991. She complained of pain in her left buttock and leg and increasing back pain which had become severe. However, Dr. Ruel noted that plaintiff got on and off the examining table very easily at that visit. Because Dr. Ruel could not find any objective findings to explain plaintiff's complaints of pain, he ordered a bone scan which was performed on December 11, 1991. The results of that test were normal.
Dr. Ruel assigned a 15% disability to plaintiff because of her neck injury. He stated that plaintiff was restricted from prolonged sitting, looking up or down for long periods, moving her arms over her head and lifting. He described her prognosis for recovery as guarded. His opinion was that plaintiff's cervical injury was the result of her fall from her office chair in May 1986. Dr. Ruel stated that he was unable to say to what extent the June 1987 automobile accident affected plaintiff's neck condition although he did say that this accident aggravated her pre-existing cervical problem. He stated that all treatment and surgical procedures performed on plaintiff were related to the 1986 chair accident.
Dr. Bert Bratton, a neurosurgeon, first saw plaintiff while she was hospitalized for diagnostic testing on November 11, 1986 at the request of Dr. Ruel. At his evaluation, he found that plaintiff had some decreased strength in her left biceps muscle and some decrease in sensation in her left arm at the C5 nerve root distribution. He reviewed her myelogram results which showed a cervical disc bulge at C4-5 and C5-6 and her CT scan results which showed a midline bulge at the C4-5 level. His diagnosis was cervical disc bulge at C4-5 and C5-6 and his recommendation was further conservative treatment at that time.
Because plaintiff's condition did not improve with physical therapy, Dr. Bratton hospitalized her in October 1987 for more testing. A cervical/lumbar myelogram was performed which showed a progression of the defect in the cervical area at C4-5 and C5-6. He initially recommended surgery on the C5-6 disc only. However, several months passed before surgery was scheduled so Dr. Bratton decided that reevaluation of plaintiff's condition was necessary to update her status. Another myelogram was performed which showed a further progression of the defects in the cervical area. At that time, Dr. Bratton determined that surgery was necessary for the discs at C4-5 and C5-6.
Dr. Bratton testified that the surgical procedure on May 4, 1988 revealed a greater degree of anterior disc rupture at C4-5 than indicated by the diagnostic testing as well as subligamentous herniation at C4-5. The anterior cervical diskectomy and fusion was successful and plaintiff was discharged from the hospital on May 7, 1988. Plaintiff reported during the post-operative period that she had received no relief from her pain in the head, neck and arm areas. Dr. Bratton ordered an EMG study in September 1989 and the results were normal. He stated that he did not believe that any additional diagnostic testing or surgery was necessary.
Dr. Bratton assigned a 10% to 15% anatomical disability to plaintiff. He stated that her prognosis is guarded. Based on the plaintiff's history, Dr. Bratton opined that *819 plaintiff's injuries were related to the May 1986 chair accident.
Plaintiff reported her June 1987 automobile accident to Dr. Bratton in October 1987. She told him that she had received a scalp laceration in the accident but that she had no change in her neck position. Based on her statement that the 1987 accident did not change her neck position, Dr. Bratton's opinion is that the 1987 accident did not have an effect on plaintiff's cervical disc injury even though the myelogram performed after the 1987 accident showed a progression of the defects in the cervical area. Dr. Bratton stated that it was his belief that plaintiff was exaggerating her complaints because the symptoms she described were more prominent than the diagnostic testing results suggested.
After review of the record as a whole, we find that the general damages award of $110,000.00, although high, was within the trial court's discretion and not manifest error. As for the award of $20,025.98 for past medical expenses, the parties stipulated as to the accuracy of plaintiff's medical bills and plaintiff sufficiently proved that these expenses were related to the May 1986 chair accident. Therefore, this award was not error.
To support her claim for past and future lost wages, plaintiff presented the testimony of economist Melville Wolfson. Plaintiff has not worked for any significant period of time since she was terminated from her employment at O'Neil & Eichin in October 1986 because she claims that the injuries from her accident left her completely disabled. Wolfson calculated the amount plaintiff would have earned if she had worked consistently until trial. He estimated her future earnings assuming varying degrees of disability on plaintiff's part.
The trial judge awarded plaintiff $75,000.00 in past lost wages and $150,000.00 in future lost wages which was significantly less than the amounts estimated by Wolfson. The trial judge based these awards on his finding that the plaintiff is not as disabled as she contends. This finding is fully supported by the record and is not manifestly erroneous.
Therefore, we find no error in the amount of damages awarded to plaintiff.
Accordingly, for the reasons assigned, we reverse that portion of the trial court judgment which finds plaintiff 30% at fault and dismisses Steelcase. We assess 30% of the fault to Steelcase. We affirm the remainder of the judgment and enter the following decree:
IT IS ORDERED that there be judgment herein in favor of plaintiff and against Ayrshire and Steelcase in the full sum of $355,025.98, plus legal interest and costs. Fault is apportioned, after reallocating the employer's fault, at 25% to Ayrshire and 75% to Steelcase.
AFFIRMED IN PART; REVERSED IN PART, RENDERED.
NOTES
[1] Since plaintiff was found three times more at fault than Ayrshire, the employer's fault was allocated at 45% to plaintiff and 15% to Ayrshire, for a total fault of 75% to plaintiff and 25% to Ayrshire.
[2] The Louisiana Products Liability Act, R.S. 9:2800.51 et seq., became effective on September 1, 1988 but is not applied retroactively. See Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991).
[3] Gauthier v. O'Brien, supra was decided by the Supreme Court on May 24, 1993, the day before the initial judgment was rendered in this case. Obviously, the trial judge became aware of that decision shortly thereafter.
[4] Plaintiff's original fault was 30% and Ayrshire's 10%.
[5] Since the plaintiff's original fault (30%) was greater than Ayrshire's (10%), Ayrshire argues that Article 2324 mandates that it (Ayrshire) "shall not be liable for more than the degree of his fault." Ayrshire argues that the fault contemplated by Article 2324 is its fault before reallocation of the employer's fault.
[6] The exceptions to this prohibition, however, are intentional acts (Art. 2324(A)) and the fifty percent rule set out in the beginning of subparagraph B.
[7] We recognize that the result may appear inequitable. See, Robertson, The Louisiana Law of Comparative Fault: A decade of Progress (1991). While we may not necessarily agree with allocating employer fault, the only response we can make is the same made by the court in Gauthier: "Either of the results characterized as undesirable may be evils made necessary by the 1987 amendments to Article 2324."