**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 98-30961

PATRICIA KRUMMEL, wife of/and; ROBERT KRUMMEL,

Plaintiffs-Appellees,

VERSUS

BOMBARDIER CORPORATION; BOMBARDIER, INC.,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana

March 27, 2000

Before DUHÉ, BARKSDALE and DENNIS, Circuit Judges.[1]

DUHÉ, Circuit Judge:

Robert Krummel and his wife, Patricia Krummel, brought an admiralty and maritime claim under Fed. R. Civ. P. 9(h) against Bombardier Corp. and Bombardier, Inc. ("Bombardier") for damages resulting from Robert Krummel's injuries while using a Bombardier personal watercraft.[2]  They alleged that the watercraft was unreasonably dangerous and Bombardier failed to warn them of these dangers.  After a bench trial, the district court held that

---

[1]Judge Dennis dissents and reserves the right to file written reasons.

[2]The Appellees pled causes of action only under the Louisiana products Liability Act and the Restatement (Third) of Products Liability.

Bombardier did not defectively design the watercraft; however, Bombardier failed to provide warnings regarding use of the watercraft. The court awarded damages. Bombardier appeals arguing that the district court erred in finding it had a duty to warn. We agree and reverse.

BACKGROUND

The Krummels in 1994 purchased two 1994 Bombardier Sea-Doo GTX watercraft ("watercraft"). Bombardier, Inc. manufactured the watercraft and Bombardier Corp. distributed it. The watercraft is designed to carry one operator and two passengers. The watercraft's footwells are approximately five and one-half inches wide and 11 inches high at the area where an operator places his or her feet. These footwells slope and therefore are not as high at the spot where the rear passenger places his or her feet. Prior to the accident, Robert Krummel read all of Bombardier's instruction manuals and watched a video. None of these materials warned him of the potential for his leg to become trapped when the vehicle tipped over. Bombardier's promotional material called falling overboard an expected part of the fun.

On August 27, 1994, Robert Krummel operated his watercraft on the Tchefuncte River, a navigable body of water located in St. Tammany Parish, Louisiana. Riding with him were Patricia Krummel, seated behind him, and their daughter, seated in front of him. While Robert Krummel was waiting on the watercraft at an idle speed for his son, using the other watercraft, to catch up, a wake struck the starboard side of the watercraft, causing the Krummels to tip

2

to the port side. As he began to fall, Robert Krummel intentionally buried his left foot into the footwell in an attempt to brace himself and keep from falling off. His wife, who had her arms wrapped around her husband, pulled on him as she fell off. Robert Krummel's foot remained in the footwell as his body continued to move to the left. His tibia and fibula snapped, and the break occurred at between eight and 11 inches up the leg.

At trial, the court heard from several witnesses regarding foot entrapment[3] accidents while riding similar watercraft. Tanya Lester testified regarding two situations where she suffered foot entrapment in a 1994 GTX watercraft. Unlike Robert Krummel, she testified that she did not intentionally bury her foot in the footwell to prevent her fall and her feet were positioned a bit farther back in the footwell than Robert Krummel's while riding the watercraft. The court found the mechanics of her accidents to be substantially similar to Krummel's. Roger Ellis also provided information regarding a leg injury suffered in a 1994 GTX watercraft; however, the court did not rely on this testimony in rendering its decision.

The court also heard testimony from plaintiff's expert witness Dr. Dean Jacobson regarding forces required to cause bone fractures. The court did not permit Jacobson to provide expert testimony as to the watercraft's design or appropriate warnings.

_____

[3]We reiterate that he could have removed his foot from the footwell. Although the district court refers to foot entrapment, the record clearly shows that the injury occurred because Krummel intentionally buried his foot in the well, and not because his foot was entrapped.

The court limited Jacobson's testimony only to the forces required to break bones. In his testimony, Jacobson said that if the height of the footwell wall were reduced a person's foot could be released without trapping. A defense expert, Dr. Peter Fuller, testified that a lower footwell height would not necessarily lessen the chance of entrapment. The court determined that this testimony was not credible. The court concluded that based on these two witnesses the height of the footwell was a factor in the propensity for the watercraft to trap a foot.

Both parties called David Price, Bombardier's company representative, to testify. Bombardier introduced evidence that it sold about 70,000 watercraft with the identical hull design between 1990 and 1995, and it had only received a few complaints. The court determined that Bombardier's accident record-keeping policies were insufficient, thereby casting doubt on Price's credibility. Price also testified regarding Bombardier's operational testing of the watercraft. Price stated that entrapment of a person's foot was a consideration during testing.

The court held that the entrapment caused by the high footwell was the sole and proximate cause of Mr. Krummel's injury. The court then made two important legal conclusions. First it determined that the 11-inch footwells did not render the product defective in design under the Restatement (Third) of Product Liability § 2(b) and the Louisiana Products Liability Act ("LPLA") La. Rev. Stat. Ann. § 9:2800.56. Second, the court held Bombardier liable for failing to warn Krummel regarding the risks posed by the

4

height of the footwell.  The court determined liability under both the Restatement (Third) of Products Liability § 2(c) and the LPLA La. Rev. Stat. Ann. § 9:2800.57(A).

## STANDARD OF REVIEW

In admiralty cases tried by the district court without a jury, we review the district court's legal conclusions de novo and its factual findings for clear error.  Sabah Shipyard SDN. BHD. v. M/V Harbel Tapper, 178 F.3d 400, 404 (5th Cir. 1999).

## DISCUSSION

Under the LPLA, a product is unreasonably dangerous because of an inadequate warning, "if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product."  La. Rev. Stat. Ann. § 9:2800.57(A).  Courts applying the LPLA have noted that even when a product is not defective, a manufacturer may have a duty to instruct reasonably foreseeable users of the product's safe use. "A manufacturer must anticipate foreseeable misuse and also consider the particular hazard.  When a product presents a serious risk of harm, the manufacturer must warn in a manner likely to catch the user's attention."  Delery v. Prudential Ins. Co. of Am., 643 So.2d 807, 813-814 (La. App. 4th Cir. 1994) quoting Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La. App. 4th Cir. 1992).

Based on the evidence presented at trial, the district court concluded that under the LPLA the watercraft was unreasonably

5

dangerous because Bombardier provided no warnings regarding the risk of foot entrapment. The court said this failure to warn amounted to a lack of reasonable care by Bombardier. Therefore, the watercraft was dangerous to an extent beyond that which an ordinary user would have or should have contemplated.

We find that the district court erred in articulating the proper legal standard under the LPLA. State and federal courts applying the LPLA have established a detailed analysis for determining liability in both design defect and failure to warn cases. See, e.g., McCarthy v. Danek Medical, Inc., 1999 WL 262987 at *2 (E.D. La.) ("Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury occurred.") In both defective design and failure to warn cases courts have applied a risk-utility analysis to determine liability. A court must first determine what risk, if any, the product created. A court must then determine whether a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. Bernard v. Ferrellgas, 689 So.2d 554, 560-61 (La. App. 3rd Cir. 1997) (applying risk-utility analysis to La. Rev. Stat. Ann. § 9:2800.56 (design defect) and § 9:2800.57). In applying the risk-utility analysis, we have said that a plaintiff must show evidence "concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design." Lavespere v. Liberty Mutual

6

<u>Ins. Co.</u>, 910 F.2d 167, 183 (5th Cir. 1990) (applying the risk-utility analysis to a design defect claim under La. Rev. Stat. Ann. § 9:2800.56).[4]

In this case, the district court found liability based solely on the fact that an injury occurred but did not properly apply the risk-utility analysis. The court heard no expert testimony regarding the risk the product created. Dr. Jacobson testified regarding forces necessary for bone fractures, not the quantum of risk inherent in the watercraft design. Moreover, other than Ms. Lester's two accidents, Krummel provided no evidence as to the frequency of such accidents. Price testified that Bombardier considered foot entrapment when designing the footwells; however, such consideration does not amount to a showing that Bombardier used unreasonable care. Even if Bombardier kept poor accident records, Krummel must provide evidence regarding the frequency of the accidents. Without evidence showing the severity of the risk created by the footwells or the frequency of foot entrapment, it cannot be shown Bombardier failed to use reasonable care. Therefore, Bombardier cannot be held liable for failure to warn under the LPLA.

---

[4] A plaintiff may not need to detail and to quantify the risk and utility of a product where the product or the design feature in question is "relatively uncomplicated and "must be such that a layman could readily grasp them." <u>Lavespere</u>, 910 F.2d at 184. In this case, the district court heard testimony that footwell height and width impacted many aspects of the watercraft, including ease of entry and exit, steering, support for the body, comfort, and buoyancy. This being so, a layperson obviously could not have grasped the adequacy of the footwell design and the need, if any, for warnings.

The Restatement (Third) of Products Liability § 2(c) requires a similar risk-utility analysis.  This provision says: "A product is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller . . . ."  Applying the Restatement, the district court determined that Robert Krummel could have reduced his chance of injury if Bombardier had warned him regarding the risk of foot entrapment.

The district court again erred in applying the proper legal standard.  Like the LPLA, the Restatement requires more extensive evidence in order to find liability.  The comments to the Restatement (Third) of Product Liability § 2 note that in design defect cases and inadequate warning cases "some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary." See id. at cmt. a. See also Whitted v. General Motors Corp., 58 F.3d 1200, 1206-7 (7th Cir. 1995) (finding that for liability for failure to warn under Indiana product liability law and citing to then-proposed Restatement (Third) of Products Liability § 2(c) a plaintiff must present evidence, via statistics or other means, to illustrate that there is a possibility the product may cause injury).  The district court again failed to apply the risk-utility analysis.  In this case, the evidence showed an injury occurred because of foot entrapment, but no evidence shed light on whether Bombardier should have foreseen - either by a pattern of similar accidents or a

8

design defect - the probability and risk of such an injury. Because the district court failed to make this inquiry, we find Bombardier did not have a duty to warn under the Third Restatement of Products Liability § 2(c).

CONCLUSION

For these reasons, we reverse and render judgment for Appellants.

REVERSED and RENDERED.

DENNIS, Circuit Judge, dissenting:

The majority, by either confusion or judicial legerdemain, purports to amend the Louisiana Products Liability Act, La.R.S. 9:2800.51 et. seq. (LPLA), so that a claimant, to recover for harm caused by a manufacturer's failure to warn, must prove essentially the same elements necessary to recover for harm caused by a manufacturer's defective design of its product. The majority's decision should not be considered a valid precedent, however, because it radically departs from the LPLA, the Louisiana jurisprudence, the Restatement (Third) Of Torts, and the virtually unanimous view of all other courts and legal scholars.

I. The Majority Misreads The Legislated Law, The
   Jurisprudence, The Record, And The Trial Court's Opinion
   The LPLA design defect and inadequate warning actions are quite different. The LPLA provides that to succeed a design defect claimant must prove, inter alia, that:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

LPLA § 2800.56 (in pertinent part). On the other hand, the LPLA provides that the inadequate warning claimant, to recover, must prove, inter alia, that:

> [The manufacturer's] product is unreasonably dangerous

10

> because [of] an [in]adequate warning . . . if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

LPLA § 2800.57A. The essential difference between the two causes of action is that the inadequate warning claimant must prove only something akin to ordinary negligence while the design defect claimant must prove "not only that there was an alternative, safer design, but also that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility)." Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 181 (5th Cir. 1990).

The majority seeks to read into the simple LPLA inadequate warning provision an analogue of the heavier, more complex burden required of a claimant by the LPLA defective design provision, by the following reasoning: (1) Both the LPLA design defect and inadequate warning actions require the courts to apply a "risk-utility" analysis to determine liability; (2) Therefore, the LPLA inadequate warning claimant must satisfy essentially the same rigorous and complex "risk-utility" test that the LPLA applies to design defect claims; (3) Therefore, the Louisiana and federal appellate decisions applying the design defect provision's complex "risk-utility" test are applicable to inadequate warning cases too;

11

(4) This court in Lavespere, 910 F.2d at 183, in affirming a summary judgment against an LPLA design defect claimant who was injured by a metal working machine that lacked operational "point of operation" safeguards, said that "Lavespere offered no evidence [of] the extent of the risk that the alternative design would have avoided . . . [i]n particular, . . . no evidence concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design."; (5) Therefore, LPLA inadequate warning claimants, as well as design defect claimants, must show evidence concerning these same factors; (6) Because Krummel presented "no expert testimony regarding the risk the product created" and "no evidence as to the frequency of such accidents" the trial court "found liability based solely on the fact that an injury occurred but did not properly apply the risk-utility analysis."; (7) Thus, the district court's judgment in favor of Krummel must be reversed.

The majority's rationale is inherently flawed in almost every link. First, although hypothetically it may be said that some form of risk-utility test might be used to analyze an LPLA inadequate warning claim, which is akin to but not the same as negligence,[5] the LPLA does not command its use but instead requires deciding

---

[5] See Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 15-11(a), at 386 (1996)(The "reasonable care" LPLA § 2800.57(A) requires "may differ from ordinary negligence because knowledge of the risk, at least for purposes of the prima facie case, may be presumed. Thus the duty upon the manufacturer is akin to, but technically is not, negligence, given the burdens of proof.")

whether the manufacturer "failed to use reasonable care to provide an adequate warning." LPLA § 2800.57. Thus, the form of risk-utility test most likely to be feasible here should closely resemble Judge Learned Hand's simple but elegant formula for negligence, "if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B < PL." United States v. Carroll Towing Co., Inc., 159 F.2d 169, 173 (2d Cir. 1947)(a maritime negligence case determining liability without expert quantification of the variables).[6] On the other hand, the LPLA § 2800.56 does command the use of a much more complex risk-utility test for determining under the alternative design theory whether the manufacturer's product is unreasonably dangerous in design. Thus, there is no basis in the LPLA for the majority's assumption that the design defect risk-utility test must be used to determine whether the manufacturer failed to use "reasonable care" to provide an adequate warning of a "characteristic [of the product] that may cause damage." And before the majority's opinion in the present case, none of the Louisiana or federal appellate courts have ever reached such a conclusion.

---

[6]Judge Hand did not assign numbers to the variables or factors or attempt to apply the formula mathematically. As he explained in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir. 1940): "All these [factors] are practically not susceptible of any quantitative estimate, and the second two [the gravity of the injury if it happens and the interest which must be sacrificed to avoid the risk] are generally not so even theoretically. For this reason a solution always involves some preference, or choice between a incommensurables, and it is consigned to a jury because their decision is thought most likely to accord with commonly accepted standards, real or fancied."

13

Second, contrary to the majority opinion, this court did not hold in Lavespere v. Niagara Machine & Tool Works, Inc. that a design defect claimant under LPLA § 2800.56 "must show evidence 'concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed design.'" Ante at ____ (quoting Lavespere, 910 F.2d at 183). Contrary to the majority's out of context rendition, the Lavespere court did not change the substantive products liability law of Louisiana by adding the passage quoted above to the risk-utility test of LPLA § 2800.56. Instead, the Lavespere court affirmed the summary judgment against the design defect claimant because he failed to present in opposition to Niagara's motion for summary judgment "evidence sufficient to enable a reasonable trier of fact to conclude that he had established the essential elements of his claim, including that the risk avoided by the alternative design outweighed the burden of adopting that design." Lavespere, 910 F.2d at 183. As the court noted earlier in the opinion, Niagara, the manufacturer, had filed in support of its motion for summary judgment, inter alia, an affidavit by its engineer and officer that it was not possible to design a "universal" point-of-operation safeguard, that is, one single safeguard capable of protecting all operators of the machine in all of its possible applications; that which safeguard is appropriate and effective varies with the bending or cutting operation to be performed; and that for these reasons it was the custom in the

14

industry not to install point-of-operation safeguards on the machines, but to leave that responsibility to the purchaser, which in the case at bar was Lavespere's employer. Id. at 171. The court explained why Lavespere's opposition evidence did not create an issue for trial:

> Although Lavespere introduced evidence that had some bearing on the risk-utility issue, it was not sufficient to carry the day. Lavespere offered no evidence concerning the extent of the risk that the alternative design would have avoided. In particular, Lavespere offered no evidence *concerning the frequency of accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design.*

Id. at 183 (emphasis added). When read in context, the words italicized above form a part of the court's explanation of the type of evidence Lavespere should have presented in opposition in that particular fairly complex design defect case, given the evidence presented by the manufacturer in favor of its motion for summary judgment, to demonstrate that there was a genuine dispute as to a material issue of fact that reasonably could be resolved in Lavespere's favor at trial. The Lavespere court did not and could not properly engraft the italicized words onto the LPLA's design defect risk-utility test. Under our admiralty jurisdiction we are authorized, in developing the general maritime law, to draw from state sources of substantive law. See Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 878 (1997); East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864-65

15

(1986)(citing authorities). As federal judges exercising admiralty jurisdiction, however, we are not empowered to change or distort the state substantive law before it is drawn upon.

In fact, the Lavespere court clearly indicated that it had no intention of adding a blanket requirement of certain types of expert evidence in alternative design defect actions under the LPLA, by stating:

> [W]e do not mean to suggest that the plaintiff must, in every case, introduce evidence that details and quantifies the risk avoided and the burden incurred in order to prevail under the defective design theory set out in the LPLA. As courts in other jurisdictions that have placed on plaintiffs the burden of proof on the risk-utility issue have suggested, there may be cases in which the judge or the jury, by relying on background knowledge and "common sense," can "fill in the gaps" in the plaintiffs case, estimating the extent of the risk avoided, the costs of implementing the proposed design change, or the adverse effects of the design modification on the utility of the machine. [141 S. Main, Inc. v. Magic Fingers, Inc., 49 Ill.App.3d 724, 728-29, 364 N.E.2d 605, 608 (1977); Duke v. Gulf & W. Mfg. Co., 660 S.W.2d 404, 412-13 (Mo.App. 1983); Wilson v. Piper Aircraft Corp., 282 Or. 61, 67-70, 577 P.2d 1322, 1326-27.] For this to be possible, however, the product itself, or at least the design feature in question, must be relatively uncomplicated, and the implications of the change in design must be such that a layman could readily grasp them. [Wilson, 282 Or. at 68-70, 577 P.2d at 1326-27; Duke, 660 S.W.2d at 412-13.]

Lavespere, 910 F.2d at 184 (internal citations in original were footnoted). The only Louisiana court which has spoken on the

16

subject agreed.  See, e.g., McKey v. General Motors Corp., 691 So.2d 164, 170 n.2 (La. App. 1st Cir. 1997)(citing and quoting Lavespere, 910 F.2d at 184).

As a practical matter, if expert and prior accident evidence are not required in every LPLA alternative design theory case, it makes no sense impose such a substantive requirement in the much less complex failure to adequately warn cases.  Inadequate warning actions do not involve the complex comparisons of the costs/benefits and risks/utilities of two different product designs that are required in design defect actions.  Indeed, the majority vaguely acknowledges in its fourth footnote that even a design defect claimant need not detail and quantify the risk and utility of the product or the design feature at issue where they are relatively uncomplicated and can be readily grasped by laymen.  However, the majority errs in pointing to the various design aspects of the footwell and gunnel to conclude that "a layperson obviously could not have grasped the adequacy of the footwell design and the need, if any, for warnings."  A district court judge is perfectly capable of relying upon his common sense and the background knowledge gleaned from evidence presented at trial to "fill in the gaps" of the plaintiff's case, if any, in estimating the extent of the risk involved in the design of a footwell on a personal watercraft.  The footwell at issue is approximately five and one-half inches wide at the bottom, 11 inches high, and sloping slightly outward so as to be wider at the top.  Certainly this design feature is relatively uncomplicated and lends itself to a

17

non-scientific determination of the extent of the risk of "foot entrapment" and the extent of risk reduction to be gained by an appropriate warning of the danger. Furthermore, if the present failure to warn case is too complex for a district court judge to understand, without adding the testimony of even more experts to those whose testimony is in the record, it is doubtful that any case will be simple enough to be tried without voluminous expert testimony or evidence of the frequency of similar accidents. (How many and what kinds of experts does the majority want?) Only very wealthy plaintiffs will be able to afford to bring an action under the majority's revised version of the LPLA.

It is self evident that the majority has perverted the meaning of the LPLA and Judge Rubin's <u>Lavespere</u> opinion in reading LPLA § 2800.57 (inadequate warning) as virtually a duplicate of § 2800.56 (defective design). After all this appeal concerns a very simple inadequate warning case, essentially an ordinary negligence case, in which Krummel's leg was broken for lack of any warning of the danger of his foot becoming trapped in the jet-ski's eleven inch deep foot well as the watercraft rolled in the wake of a passing boat. Bombardier, the manufacturer, admitted that it was aware of this danger and consciously chose not to eliminate it with an alternative design or to provide consumers with any warning of this characteristic that could cause injury. Contrary to the majority opinion, the trial judge heard the testimony of several expert witnesses (some of whom used a model of the footwell in their testimony) which, in my opinion, fully explained the dynamics of

18

the accident and fully supports the trial judge's finding that Bombardier had foreknowledge of the risk, that the gravity of potential harm was significant, and that an adequate warning would have alerted Krummel and enabled him to avoid the dangerous trapping characteristic. The majority concedes that Krummel introduced evidence of two similar accidents involving the same model jet-ski, and the evidence strongly indicates that Krummel was unable to introduce more because Bombardier was guilty of spoliation of evidence of previous accidents. The trial judge was justified in having serious doubts as to the credibility of the manufacturer's representative who testified that the company had sold 70,000 of the same model watercraft between 1990 and 1995, that the manufacturer had no policy requiring the retention of records of accidents or complaints, and that he had never heard of an alleged leg entrapment with any Bombardier product until Krummel's accident; and who became evasive and would not directly answer the question of whether any discoverable list of prior complaints existed.

II. Louisiana Jurisprudence

The majority incorrectly states the provisions of the LPLA and Louisiana jurisprudence. Under the LPLA, a failure to warn claimant bears the burden of establishing that "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers

of the product[;]" and that the failure to do so proximately caused the claimant's injuries.  LPLA §§ 2800.54 and 2800.57.  The trial court articulated and applied a similar standard provided by the Restatement Third, Torts: Products Liability § 2 (c), which states that a product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instruction or warnings . . . and the omission of the instructions or warnings renders the product not reasonably safe."  See Krummel v. Bombardier Corp., 1998 WL 433803, p.9 (E.D.La.).  The trial court also articulated and applied factors of guidance "such as the foreseeability and gravity of the risk, the likelihood that an intermediary will convey the information to the user, and the feasibility and effectiveness of a direct warning to the user." Id. (citing Restatement Third, Torts: Products Liability § 2 at cmt. i).  The majority is simply mistaken in concluding that the LPLA requires that a failure to warn claim absolutely must be judged by  an articulated "risk-utility" test rather than LPLA § 2800.57's "reasonable care" standard.   Also, the majority completely ignores the fact that the trial court articulated and applied the guidance factors of Restatement Third, Torts: Products Liability § 2, cmt i, which constitute a form of risk-utility test adapted specifically to a failure to warn claim.

Contrary to the majority's representations, there is no Louisiana or federal appellate court decision holding that, under the LPLA, (1) the adjudication of a failure to warn claim

20

categorically requires articulation and application the "risk-utility" test; or (2) the adjudication of a design defect or a failure to warn claim categorically requires the plaintiff to introduce expert evidence concerning the frequency of similar accidents, economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of an alternative design or a proposed warning or instruction. The majority cites Bernard v. Ferrellgas, 689 So.2d 554 (La. App. 3rd Cir. 1997) and Lavespere v. Niagra Mach. & Tool Works, Inc., 910 F.2d 167 (5th Cir. 1990) as supporting its conclusions. But both of these cases involved only LPLA design defect claims and did not address or mention failure to warn claims. Moreover, the Bernard case actually used a duty-risk formula based on pre-LPLA cases to decide that the trial court erred in granting a directed verdict for the manufacturer. Under the LPLA, unlike the failure to warn action provided by § 2800.57, which requires only proof that the "manufacturer failed to use reasonable care to provide an adequate warning," the design defect action under § 2800.56 imposes a more onerous and complex burden on the plaintiff, including proof of an alternative design and an expressly prescribed risk-utility balancing test. Thus, the Lavespere and Bernard courts' discussion of the risk-utility balancing test in design defect cases carries with it no suggestion that the test should be read into failure to warn actions under § 2800.57. Furthermore, in neither case did the court hold that the introduction of expert testimony, or evidence of frequency of similar accidents is

21

absolutely and categorically required even in judging LPLA design defect claims.

McCarthy v. Danek Medical, Inc., 65 F.Supp.2d 410 (E.D.La. 1999), cited by the majority, does not support the majority's decision. In that case, the court stated: "The LPLA in part defines adequate warning to be one that 'would lead an ordinary reasonable user to contemplate danger in using or handling the product.'" McCarthy, 65 F.Supp.2d at 413. "This generally is not a technical area that would require expert proof." Id. at n.2 (citing Wright v. Kemper National Ins., 1995 WL 527615 (E.D.La)).

The LPLA § 2800.57(A) "does not change Louisiana law, and as required by prior law, a manufacturer must use reasonable care in deciding whether to warn." Dunne v. Wal-Mart Stores, Inc., 679 So.2d 1034, 1038 (La.App.1st Cir. 1996)(citing John Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 616 (1989)).[7] The majority does not cite, and I have not found, any

---

[7] The result is the same under the Restatement. Sections 2(b) and 2(c) governing design defect and failure to warn cases "rely on a reasonableness test traditionally used in determining whether an actor has been negligent." Restatement Third, Torts: Products Liability § 1, comment a (citing Restatement Second, Torts §§ 291-293). In this negligence analysis, the defendant-manufacturer is held to the expert standard of knowledge available to the relevant manufacturing community when the product was manufactured. Id. Even though § 2(b) requires a plaintiff to prove that a reasonable alternative design would have reduced the foreseeable risks of harm to recover for a design defect, that subsection does not require the plaintiff to produce expert testimony in cases in which the feasibility of a reasonable alternative design is obvious and understandable to laypersons, because expert testimony is unnecessary to support a finding that the product should have been designed differently and more safely. Id. at § 2, comment f. Moreover, in both design defect and warnings cases a seller bears responsibility to perform reasonable testing prior to marketing a product and to discover risks and risk-avoidance measures; thus, a

22

Louisiana case interpreting the LPLA as requiring expert testimony or evidence of the frequency of prior similar accidents as legal prerequisites to proof of a claim based on failure to provide adequate warnings. Louisiana products liability jurisprudence under the Civil Code contained no requirement of expert evidence in failure to warn cases, and there is precedent that no such pre-condition to recovery is implied by the LPLA.[8] See, e.g., Terrebonne v. Goodman Mfg. Corp., 687 So.2d 124, 128-29 (La.App. 5th Cir. 1996); Dunne v. Wal-Mart Stores, Inc., 679 So.2d at 1038-39.

The majority's reliance upon Whitted v. General Motors Corp., 38 F.3d 1200 (7th Cir. 1995), is confused and misplaced. In that case the Seventh Circuit based its decision on Indiana product liability law . The Whitted court cited ALI Tentative Draft No. 1, § 2(c) only for the proposition that "[f]or one to be liable for a failure to warn, the product in question must be unreasonably dangerous." Id. at 1206.

Louisiana's general rule evidently is that expert testimony is only required to establish the applicable standard of care in negligence cases in which lay persons cannot find or infer

---

seller is charged with knowledge of what reasonable testing would reveal. Id. at comment m. If testing is not undertaken or is inadequate and results in a defect that causes harm, the seller is subject to liability for that harm. Id.

[8]See La.R.S. 9:2800.59(B)("a manufacturer of a product shall not be liable for damage proximately caused by a characteristic of the product **if the manufacturer proves** that, at the time the product left his control, he did not know and, **in light of then-existing reasonably available scientific and technological knowledge, could not have known** of the characteristic that cause the damage or the danger of such characteristic")(emphasis added).

23

negligence by applying common sense.  See, e.g., Greenhouse v. C.F. Kenner Assoc. Ltd. Partnership, 723 So.2nd 1004, 1008 (La.App. 4th Cir. 1998); cf. Pfiffner v. Correa, 643 So.2d 1228, 1234 (La. 1994) ("expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim."); D & O Contractors, Inc. v. Terrebonne Parish Sch. Bd., 545 So.2d 588, 591 (La.App. 1st Cir. 1989)(same regarding proof of negligence of architect); Watkins v. Sheppard, 278 So.2d 890, 892 (La.App. 1st Cir. 1973) (same regarding proof of negligence in attorney malpractice claim).[9]

Evidence of prior similar accidents has not been deemed a requisite to recovery under the LPLA for failure to warn claims as evidenced by numerous cases in which plaintiffs recovered without producing such evidence.  See, e.g., Hooker v. Super Products Corp., 1999 WL 459360 (La.App. 5th Cir.); Moore v. Safeway, Inc., 700 So.2d 831, 848-52 (La.App. 1st Cir. 1996); Terrebonne, 687 So.2d

_____

[9]As a general rule, expert testimony is not necessarily required in order to prevail in a products liability action based on a manufacturer's failure to provide adequate warnings.  See, e.g., Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 700-01 (1st Cir. 1988); Cocco v. Deluxe Systems, Inc., 516 N.E.2d 1171, 1174 (Mass.App.Ct. 1987), review denied, 519 N.E.2d 595 (Mass. 1988); Dion v. Graduate Hospital of University of Pennsylvania, 520 A.2d 876, 881 (Pa.Super.Ct. 1987); Macri v. Ames McDonough Co., 512 A.2d 548, 552 (N.J.Super.A.D. 1986); Billiar v. Minnesota Mining & Mfg. Co., 623 F.2d 240, 247 (2nd Cir. 1980); Young v. Elmira Transit Mix, Inc., 383 N.Y.S.2d 729, 731 (N.Y. App. Div. 1976); Rainbow v. Albert Elia Bldg. Co., 373 N.Y.S.2d 928, 931 (N.Y. App. Div. 1975); Black v. Public Service Elec. & Gas Co., 265 A.2d 129, 136 (N.J. 1970); cf. Restatement Third, Torts: Products Liability § 2(b), comment f (even though the plaintiff in a design defect case must prove that a reasonable alternative design would have reduced the foreseeable risk of harm, subsection (b) does not require the plaintiff to produce expert testimony in every case).

24

at 127-29; <u>Dunne</u>, 679 So.2d at 1038-39; <u>Mayo v. Nissan Motor Corp. In U.S.A.</u>, 639 So.2d 773, 784-85 (La.App. 3rd Cir. 1994); <u>cf</u>. <u>Delery v. Prudential Ins. Co. of Am.</u>, 643 So.2d 807, 814 (La.App. 4th Cir. 1994)(pre LPLA); <u>Brantley v. General Motors Corp.</u>, 573 So.2d 1288, 1292 (La.App. 2nd Cir. 1991)(same); <u>Beauhall v. Sears, Roebuck & Co.</u>, 526 So.2d 479, 482-83 (1st Cir. 1988)(same).[10]  This is not to say that a plaintiff may not offer evidence of prior similar accidents if it is available; rather, only that a plaintiff is not required by substantive law to do so to establish a duty to warn.

> III. The District Court's Decision Should Be Affirmed As A Proper Application Of The Correct Legal Principles To Findings Of Fact Fully Supported By The Evidence

District Judge Fallon decided this case correctly.  <u>Krummel v. Bombardier Corporation</u>, 1998 WL 433803 (E.D.La.).  I append his findings of facts and conclusions of law.

The essential facts are not in dispute.  Mr. Krummel's left leg was broken when his jet ski was struck on the starboard by a large wake from a passing boat, causing it to list abruptly to the port side.  As required by the jet ski's design and instruction manual, Mr. Krummel, seated in the operator's position, had inserted his

---

[10]The prevailing view seems to be that evidence of other accidents or complaints may be admissible but is not necessarily required in a warning case because this is but one way by which a plaintiff may prove the knowledge or foreseeability of danger necessary to establish a duty to warn and to challenge a manufacturer's claim that it was unnecessary to inform its buyers of its product's hazards.  <u>See</u> Am. Law Prod. Liab. 3d § 34:17.

legs and feet (covered with rubber booties) into the port and starboard footwells, each of which was five and one-half inches wide and 11 inches deep. When the jetski reached the farthest point of its list to port, and either stopped or began to right itself, the momentum of Mr. Krummel's body caused his left foot and lower left leg to become lodged against the base and wall of the footwell. His upper left leg, however, continued to bend with the force of his body's momentum until the tibia and fibula of his left leg were broken between eight and 11 inches above the bottom of his left foot.

Mr. Price, the manufacturer's safety consultant, testified that he was involved in the safety design and testing of the watercraft in question. He acknowledged that the manufacturer was aware of and considered the risk of footwell entrapment in adopting the watercraft's design, but he indicated that alternative designs that would have eliminated or reduced that risk were rejected as being too costly or burdensome in terms of product utility and creation of other more serious product risks. The testimony of the plaintiff's and the defendant's medical experts and the plaintiff's mechanical and biomechanical engineering expert corroborated that there is a risk or a probability that a left human leg confined in a space with the dimensions of the left footwell would be entrapped and broken when a force is applied to the human's body from the right side equal to the force of momentum produced by Mr. Krummel's body in the tilting of the watercraft after it was struck by the three foot wake of the passing boat.

Dr. Dean Jacobson, accepted by the district court as an expert in biomechanical engineering, opined that due to the momentum created by Mr. Krummel's falling sideways to his left off the watercraft while his left foot was bottomed in the watercraft's left footwell, fractures of the left tibia and fibula can reasonably be expected to occur in a "bending" break at a force of less than 100 pounds depending upon the exact position of the body.[11]  Dr Jacobson concluded: "[T]hese calculations show that because of the design of the gunnel -- and I have to refer to the design because that's what this was based upon -- when we look at the design of the gunnel and the dimensions of the leg and the way in which a body can exit the watercraft that we can achieve those forces given trapping in this particular gunnel, in this situation that we have, we can achieve the forces necessary to break the leg either in twisting or in bending."

The Krummels also produced expert testimony from Dr. Joseph Rauchwerk, an orthopaedic surgeon.  Dr. Rauchwerk testified that Mr. Krummel suffered a fractured tibia and fibula that was fully consistent with a three-point bending break caused by his foot being fixed in the footwell (point one), while the leg was also fixed

---

[11]Dr. Jacobsen testified wholly within his area of expertise as accepted by the trial court.  Because he was not accepted by the trial court as an expert in watercraft design, he was not allowed to compare or contrast risk of harm from foot entrapment arising from of alternative designs -- testimony that would have been primarily relevant to the design defect claim that the district court rejected.  However, Dr. Jacobsen testified regarding the risks posed by the footwell design that was adopted and integrated into the watercraft and that caused Mr. Krummel's leg fractures.

against the wall of the watercraft at a height of 11 or 12 inches (point two), and the third force was generated by his body falling out of the watercraft (point three).

Thus the majority's characterization of this testimony as "regarding forces necessary for bone fractures, not the quantum of risk inherent in the watercraft design" is erroneous. Only by mischaracterizing this expert testimony can the majority assert that "[t]he court heard no expert testimony regarding the risk the product created." Dr. Jacobson's and Dr. Rauchwerk's expert testimony was certainly evidence of the likelihood and seriousness of the risk of harm that occasioned the Krummels' injuries -- a broken tibia and fibula sustained by Mr. Krummel as a result of the dangers inherent in the watercraft's footwell design. Moreover, Dr. Peter Fuller, Bombardier's own expert in anatomy and injury mechanisms concurred: "it is my opinion that that's what we call a bending type fracture; in other words, one part of the leg was held in and the other part was moved relative to that, what we call a bending fracture." Dr. Fuller also testified that it is possible, and in some situations even probable, that a bending fracture of the tibia and fibula will occur as a result of wave action causing an individual to go over the side of a watercraft while his leg in confined in an area 11 inches deep and five and one-half inches wide. Finally, Dr. Fuller's testimony supported the Krummels' failure to warn claim because he repeatedly acknowledged that the footwell design would cause a fracture like that suffered by Mr. Krummel under the circumstances of the accident, but that lowering

28

the height of the gunnel would not reduce the likelihood of injury but would only change the location of the injury. While this testimony supports the district court's rejection of the design defect claim if found credible, it also supports the district court's conclusion on the failure to warn claim since it points out the inherent danger of design of the gunnel. "When an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe." Restatement Third, Torts: Products Liability, § 2, comment l.

Ms. Lester testified that on two occasions in 1996 and 1997 her leg had been injured when it had become temporarily entrapped in the footwell of the same model watercraft as Mr. Krummel's. It is undisputed that the manufacturer did not provide Mr. Krummel with any warning as to the danger of leg injury or fracture caused by footwell entrapment or any instructions as to the avoidance or escape from such risks. The manufacturer's witnesses offered no explanation for its having failed to do so, and Mr. Price acknowledged that even though entrapment was a primary concern in the footwell design process, no tests were ever conducted by Bombardier to ascertain the magnitude of the risk of foot entrapment posed by the footwell design that was integrated into the product and that caused the leg injury to Mr. Krummel. Moreover, both at trial and on appeal Bombardier argues that, on the one hand, the footwell design posed no significant risk of harm about which to warn, and on the other hand, that no warning was required because

the risk of foot entrapment was open and obvious.

Judge Fallon found that entrapment caused by the footwell was the sole and proximate cause of Mr. Krummel's injury, and that Mr. Krummel's failure to avoid the mishap was not contributory negligence, because he had not been forewarned of the risk or instructed as to what defensive action could be taken to avoid injury. Nevertheless, Judge Fallon rejected the plaintiffs' claim that the 11-inch footwells rendered the product defective in design. Although the manufacturer admitted that it foresaw the risk of entrapment and elected not to change the design to eliminate it, the district judge concluded that the plaintiffs failed to show that their alternative design involving lowered footwells would not have introduced into the product other dangers of equal or greater magnitude. However, Judge Fallon found that the height of the footwell posed a definite risk that was both foreseeable and known to the manufacturer, which rendered the watercraft defective due to the manufacturer's failure to provide adequate instruction or warning regarding the dangers associated with entrapment. In reaching these conclusions, Judge Fallon cited, quoted and applied the Restatement (Third) of Products Liability § 2(c)(a product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instruction or warnings . . . and the omission of the instructions or warnings renders the product not reasonably safe.") and the Louisiana Products Liability Act (LPLA), La. R.S. § 9:2800.57A ("A product is

unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its dangers to users and handlers of the product."). Applying these provisions, Judge Fallon reasoned that (1) the known and foreseeable risk of entrapment and gravity of potential harm was significant; (2) a warning attached to the watercraft and/or contained in the promotional material, manual, or video, would almost certainly have reached Mr. Krummel and reduced his chance of injury; and, as a result, (3) the manufacturer's failure to use reasonable care to provide an adequate warning regarding the footwells and the danger of entrapment caused Mr. Krummel's injuries. Accordingly, Judge Fallon concluded that the product was dangerous to an extent beyond that which ordinary users like the Krummels would have or should have contemplated.

Thus, the majority erred not only in concluding that expert testimony was required by the LPLA in this failure to warn case, but also in concluding that the district court based liability solely upon the fact of the injury and without sufficient evidence of a risk of harm to find that Bombardier owed a duty of care to the Krummels to warn against the risk of foot entrapment.

For the foregoing reasons, I respectfully but emphatically dissent.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


PATRICIA KRUMMEL, wife of/and          *          CIVIL ACTION

ROBERT KRUMMEL

VERSUS                                 *          NO. 95-2737

BOMBARDIER CORPORATION, and            *          SECTION "L" (5)

BOMBARDIER, INC.

:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  PROCEDURAL HISTORY

On August 27, 1994, while operating his 1994 Sea-Doo Model GTX Bombardier personal watercraft vehicle ("wat ercraft"), Robert Krummel fell from his watercraft, fracturing the tibia and fibula of his lower left leg.  Mr. Krummel and his wife, Patricia Krummel, brought an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure, alleging that their damages were caused solely by the unreasonably dangerous nature of the watercraft and by defendants' failure to warn them of the dangers inherent in the normal use of the watercraft.  Defendants deny that their watercraft was in any way defective or that its warnings were inadequate.  Bombardier also asserts that any injury plaintiffs suffered was caused by Mr. Krummels' own negligence and the negligent acts of a third party.   This cause came on for a non-jury trial on December 1, 1997 and concluded on December 3, 1997.

The Court has carefully considered the testimony of all of the witnesses, the exhibits entered at trial, and the record.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.  To the extent that any findings

of fact constitute conclusions of law, the Court hereby adopts them as such, and to the extent that any conclusions of law constitute findings of fact, the Court hereby adopts them as such.

## II.  FINDINGS OF FACT

### A.  LIABILITY

(1)

Plaintiffs purchased a 1994 Bombardier Sea-Doo GTX watercraft from Spotswood Honda in Mobile, Alabama in April 1994.  They subsequently purchased a second 1994 GTX watercraft from St. Tammany Marine in Mandeville, Louisiana.

(2)

The 1994 GTX watercrafts plaintiffs purchased were manufactured by defendant Bombardier, Inc. and distributed by defendant Bombardier Corporation (hereinafter collectively referred to as "Bombardier").

(3)

The Bombardier 1994 GTX watercraft is approximately 119 inches in length, 46.9 inches in width, 37.4 inches in overall height, and designed to carry one operator and two passengers.

(4)

The watercraft footwells, located on the port and starboard sides of the 1994 GTX watercraft, are approximately $5^{1/2}$ inches wide and 11 inches high at the area where an operator of the watercraft places his or her feet.  The footwells slope, so that the footwells are not as high at the spot where a rear passenger places his or her feet.  The design characteristics of the footwell, including the height and width, were clearly visible to Mr. Krummel.  (Tr. at 114.)

(5)

Bombardier's 1990 through 1995 GTS and GTX watercrafts all have the same hull structure, including footwell design.

(6)

Prior to operating the watercraft, Mr. Krummel read all of the instruction manuals and

33

pamphlets provided to him by the seller and viewed the video produced by Bombardier. (Tr. at 63-64.) None of these materials warned him of the potential for his leg to become trapped when the vehicle tipped or turned over. Portions of Bombardier's promotional material touted "falling overboard" as "an expected part of the fun." (Pla.'s Ex. 45, Sea-Doo brochure, "Everybody's Doin' It Safely," at 20).

(7)

On August 27, 1994, Mr. Krummel was operating his watercraft on the Tchefuncte River, a navigable body of water located in St. Tammany Parish, Louisiana. Riding with him was Ms. Krummel, seated behind him, and their daughter, seated in front of him. Sea conditions were calm; weather and visibility were good.

(8)

As Mr. Krummel headed in a northerly direction, he stopped to allow his son, who was operating their other watercraft, to catch up. The transmission was engaged, at an idle speed of approximately three to five miles an hour. (Tr. at 53.) While waiting, a large wake caused by a boat passing in a southerly direction struck the starboard side of the watercraft, causing the Krummels to tip to the port side.

(9)

As he began to fall, Mr. Krummel intentionally "buried" his left foot into the well, in an attempt to brace himself and keep from falling off. (Tr. at 111.) Ms. Krummel, who had her arms wrapped around her husband, pulled on him as she herself fell off.

(10)

As Mr. Krummel fell to his left, the watercraft either began to right itself or simply failed to tip over completely to the left. Mr. Krummel's left foot remained in the foot well. As his upper leg and the remainder of his body continued to move to the left, the watercraft did not and his tibia and fibula snapped. The break occurred at between 8 and 11 inches up the leg. (Tr. at 271.)

34

Based on X-rays of Mr. Krummel's foot, Dr. Joseph Rauchwerk[12] testified that Mr. Krummel's foot was fixed at the base while the top of his leg was fixed approximately 11 or 12 inches from the base. (Tr. at 273-74.) As Mr. Krummel fell away from the boat, the bending increased until the bone failed. (Tr. at 274.) Dr. Rauchwerk described the phenomena as "fixing or trapping," and explained the torque and compressive forces at play. (Tr. at 275.)

(11)

The Court heard testimony from Tayna Lester. Ms. Lester testified that in 1997 she was riding as the middle of three passengers of a 1994 GTX watercraft. (Tr. at 15.) The Court notes that this is the same position on the same watercraft as Mr. Krummel occupied. While traveling at approximately 25-30 mph, she fell off the watercraft. She testified that "the side caused my foot to be locked in there and my legs couldn't freely just fall off the bike." (Tr. at 16.) She sought and obtained medical treatment for her swollen leg at the emergency room, where she was diagnosed with a hematoma and dent to the outside of her shin. (Tr. at 17.) After visually inspecting and then touching her leg, the Court noted that the dent mid-calf on the outside of her left leg was obvious to sight and feel. (Tr. at 18.)

(11)

In 1996, while riding as the rear passenger of a watercraft traveling at approximately 15 mph, Ms. Lester also fell off. The "same thing happened to my right leg," hitting her leg on the side of the footwell. (Tr. at 21.) She suffered a dent to her leg, not as severe, she opined, because the footwell is "not as high in the back as it is in the middle" and because the boat was not traveling as fast. (Tr. at 21.)

(12)

Under cross-examination, Ms. Lester admitted that her feet in the 1997 incident were

---

[12]Mr. Krummel's orthopaedic surgeon.

positioned "a bit" farther back than Mr. Krummel's.[13] (Tr. at 21.) She also asserted that she did not intentionally "bury" her foot into the footwell to prevent her fall, but instead tried to throw herself off. However, despite her efforts at free fall, she noted that "the side hits you each time." (Tr. at 21.)

(13)

The Court finds Ms. Lester's version of the accidents--that her leg became temporarily trapped in the footwell, causing an injury to that portion of her leg that struck the top of the footwell--to be credible. The Court also finds that the mechanics of her accidents, especially the 1997 accident, was substantially similar to Mr. Krummel's.

(14)

The Court also heard testimony from Roger Ellis regarding a leg injury he sustained on May 15, 1994 while operating a 1994 GTX. The Court finds that the accident was relevant and admissible. However, based on evidence that Ellis was "wake jumping" and the opinion of defendant's expert Dr. Peter Fuller that the leg break was a compression fracture and not caused by trapping, the Court questions the substantial similarity of Mr. Ellis' accident and does not rely on this incident in reaching its conclusions as to plaintiffs' claims.

(15)

The Court heard expert testimony from Dr. Dean Jacobson on the topic of the forces required to cause bone fractures. Dr. Jacobson testified as to the trapping nature of a footwell, illustrating this with the use of a model, the dimensions of which approximated the actual footwell. (Tr. at 231-32.) Dr. Jacobsen testified that if the height of the footwell wall were reduced, "the rotation of the body can go further and further until basically the body can be released without trapping between the gunnel [footwell] wall and the bottom of the channel where the foot could

_____

[13]On redirect she described her foot positioning as "fairly close" to Mr. Krummel's. (Tr. at 21.)

potentially wedge against the other side." (Tr. at 232.) In addition, a lower footwell wall "allows for maneuverability in the knee," and "the more flexibility you have in this direction, the less chance there is for entrapment forces to occur at the bottom." (Tr. at 242.) The Court finds Dr. Jacobsen's description and calculation of the various forces and conditions at play and the dynamics of the trapping to be accurate and informative.

(16)

On the contrary, while the Court accepts the testimony of defendant's expert witness, Dr. Peter Fuller, as to the cause of Mr. Ellis' break, the Court does not find Dr. Fuller credible on the key issue of whether a lower footwell height would lessen the chance of entrapment. Dr. Fuller would not agree that lowering the footwell height would decrease the likelihood of a fracture. Instead, he repeatedly insisted that lowering the height would only "lower the position [on the leg] of the fracture," and "not lower the likelihood" of a fracture occurring. (Tr. at 376; *see also* Tr. at 380, 372, 353 (noting that "the height of the gunnel [footwell] really has no bearing on the fracture other than the position of the fracture.")) The Court finds Dr. Fuller's testimony on this point to be contrary both to Dr. Jacobsen and to reason. Obviously, as Dr. Fuller admitted, when no footwell is present, there is no chance of a trapping fracture, but when the foot is in a confined area with an 11-inch high wall, trapping is possible. (Tr. at 371-72.) The evidence shows that at some low footwell height, even if it be only an inch, the leg would necessarily fall away from the footwell without getting trapped, or would at least not suffer the forces necessary to break bone. At some higher height, trapping is possible, as happened in this case. To say that increasing the footwell height does not increase the chance of trapping appears to the Court contrary to logic and to the evidence presented.

(17)

The Court finds that the credible evidence supports the conclusion that the height of the footwell was a factor in the propensity for the watercraft to trap a leg.

(18)

37

Both the plaintiffs and the defendants called Mr. David Price, Bombardier's company representative. Mr. Price's testimony covered both product safety testing and handling complaints regarding Bombardier's products.

(19)

Bombardier introduced evidence that it sold approximately 70,000 watercrafts with the identical hull design between 1990 and 1995, and that it did not receive a single complaint until after Mr. Krummel's accident, and only two or three since. (Tr. at 327.)

(20)

Price, however, admitted that there was no uniform policy for the retention of documents regarding complaints. Rather, record retention policies were "the responsibility of the director of the particular department to define," there was no written policy. (Tr. at 158.) Price admitted that there might not be any documentation for complaints that he felt were unfounded, and that he "wouldn't necessarily maintain that particular document in the file." (Tr. at 160.) Price candidly admitted that even were Mr. Krummel to call and report his accident today, Bombardier "may or may not [document it]. It depends on the information provided to me. And again, I may not put it down in writing." Price was also asked whether any discoverable list of complaints existed. Price evaded the question, and did not acknowledge, let alone produce, any such list. (Tr. at 341.)

(21)

The Court finds Price and Bombardier's record-keeping policies to be insufficient, especially for an operation as large and as established as Bombardier. Such inadequacies in the receipt and handling of complaints casts serious doubts or Mr. Price's credibility when he proclaimed that "until Mr. Krummel's case, I have never heard of an alleged leg entrapment at all with any of the Bombardier products." (Tr. at 171.)

(22)

Mr. Price also testified as to the extensive operational testing and evaluation by Bombardier, the most relevant part of which concerned the dimensions of the footwells. Price

38

specifically stated that "whether or not there would be entrapment of the person's foot" was a consideration. (Tr. at 173.) In fact, "[m]y first consideration, of course, sitting on the product and utilizing the product, is entrapment." (Tr. at 319.) However, entrapment was far from the only factor in selecting the correct footwell dimensions. Price testified that footwell height and width was a consideration in regard to many aspects of the watercraft, including: ease of entry and exit; steering and turning ability; support for the body; comfort; protection against impacts, especially from the side; ability to reboard; bracing ability versus ease of reboarding; and buoyancy, especially as the load increases. (Tr. at 173-74, 319-20.)

## B. INJURIES

### (23)

After his injury, Mr. Krummel had five operations to his leg--the initial setting and rodding, a bone screw, repair of a hernia of the tissue around the wound, removal of the rod, and a removal of the sutures.

### (24)

Mr. Krummel's treating physician, Dr. Mark Hontas, appeared via deposition. Dr. Hontas performed much of the surgery on Mr. Krummel's leg--putting in the rod, taking out the screw, and repairing the herniation. He released Mr. Krummel to work in February of 1995, and to work full duty in March of 1995. Mr. Krummel was "unusually" adamant about having the rod removed and the herniation operated on, despite Dr. Hontas' advice to the contrary. (Hontas Depo. at 22-24.) Dr. Hontas described Mr. Krummel's obstinance in wanting things done in a certain way and his excessive concern and fixation regarding his injury. (Hontas Depo. at 24-26.) Dr. Hontas saw no connection between Mr. Krummel's injury and the pain he reported in the bottom of his foot, and future nerve conduction studies failed to explain the burning sensation or show any abnormalities. (Hontas Depo. at 41-47.) He reiterated his feeling that Mr. Krummel can "be very fixated on certain aspects of his injury, and sometimes these can become magnified and blown up, even though in his mind that might be very real to him." (Hontas Depo. at 48.)

(25)

Dr. Hontas testified that any restriction he placed on Mr. Krummel's work would have been based on Mr. Krummel's complaints of pain, and not on any of the tests Dr. Hontas conducted. (Hontas Depo. at 49.) Dr. Hontas explained his puzzlement that Mr. Krummel felt "a lot of pain in that area where he didn't show signs of a painful condition, that is, no swelling, no redness, puffiness." (Hontas Depo. at 50.) With all of the "objective tests" turning up negative, Dr. Hontas could only state that if he "entertained" a diagnosis of reflex sympathetic dystrophy ("RSD"), he would have to restrict Mr. Krummel's work requirements. (Hontas Depo. at 53). It would be "difficult" to restrict him from an "orthopedic point of view," and any restriction would be necessary only if in "Mr. Kummel's mind he actually feels that he has a problem down there in spite of the fact that we're not finding anything." (Hontas Depo. at 53.)

(26)

When asked whether he could diagnose RSD, Dr. Hontas candidly admitted "I'm not sure it [RSD] is going on" and that he "would probably get another opinion." (Hontas Depo. at 54.) He affirmed that the bones were at full strength, that Mr. Krummel had one hundred percent range of motion, the same flexibility as in his uninjured leg, and no orthopedic impairment. He noted that a complaint of pain so disproportionate to the results of the diagnostic tests did not mean that Mr. Krummel was "faking it" or that he did not "feel" pain. (Hontas Depo. at 64-65).

(27)

Dr. Hontas opined that it was more probable than not that Mr. Krummel was "not at the end of the road" with respect to his leg. (Hontas Depo. at 67.) Dr. Hontas stated that prolonged standing and working would increase any inflammation, but that no "significant inflammation was seen." (Hontas Depo. at 68.) He flatly denied that the thickening of the bone could explain Mr. Krummel's problems.

(28)

Dr. Joseph Rauchwerk, Mr. Krummel's orthopaedic surgeon, testified that Mr. Krummel

40

had difficulty walking on his left heel and had pain in this heel, but that he had a normal gait. (Tr. at 269.) Dr. Rauchwerk reported tenderness in the damaged area, but normal sensory response. (Tr. at 270.) Dr. Rauchwerk noted a decreased range of ankle motion, but fully healed fibula and tibia. (Tr. at 270-71.) He ruled out nerve entrapment and joint damage. (Tr. at 270.)

(29)

Dr. Rauchwerk saw signs of RSD. (Tr. at 273.) However, he saw no disability. (Tr. at 276.) Several common indicators of this dystrophy, skin changes, bone demineralization, and sensory abnormalities (except for the scar area itself) were absent. (Tr. at 277-8.) The RSD, if any, was in its first stages. (Tr. at 281.)

(30)

Mr. Krummel was referred to Dr. Alan Parr, who concluded, via deposition, that Mr. Krummel suffered from RSD, based on hyperpathia, allodynia, bluish appearance in his middle toes, and burning pain. (Parr Depo. at 7.) However, Dr. Parr did not continue to treat Mr. Krummel, and he could only say that he "thought" it was RSD. (Parr Depo. at 12.) Dr. Parr stated that he needed to do two more tests to "clinch" that Mr. Krummel suffered from RSD. However, Mr. Krummel refused to follow the treatment plan of Dr. Parr. Upon leaving Dr. Parr's office, "Mr. Krummel crumbled his prescription and threw them down on the floor and said a gun . . . is easier and left," at which point Dr. Parr felt compelled to call 9-1-1. (Parr Depo. at 21.) Mr. Krummel did not make another appointment. (Parr Depo. at 23.)

(31)

Dr. Parr testified that RSD is easier to treat in its acute phase than in its prolonged, chronic phase when it becomes "imprinted in the spinal chord." (Parr Depo. at 28.) If someone seeks treatment for RSD soon after an accident, "I should be able to treat them pretty much readily, and I think that they would get better, as opposed to [Mr. Krummel]." (Parr Depo. at 29.) As of the eve of trial, Dr. Parr could recommend implanting a spinal cord stimulator or possibly a sypathectomy procedure, either costing roughly $25,000.

41

(32)

Plaintiffs also introduced deposition testimony from Dr. William Barfield. Dr. Barfield examined Mr. Krummel once, and concluded that there was no nerve entrapment and that while there was evidence of weakness, a slight atrophy of the muscles, and some sensory decrease, the deep tendon reflexes were equal, motor tone and strength appeared to be fairly good, and other parts of his neurological exam appeared within the normal limits. (Barfield Depo. at 9-10.) The rest of the examination "appeared to be fairly normal." (Barfield Depo. at 10.) He concluded that Mr. Krummel suffered from "a pain syndrome resulting from traumatic and surgical procedures," a "severe painful experience evolving from a medical injury or condition," and moderate to severe pain "associated with disability and requirement [sic] of medications or other modalities of treatment." (Barfield Depo. at 10, 14-15.)

(33)

Defendant introduced the results of a nerve conduction study showing normal nerve conduction for the left perineurial, sensory, psurosensory, motor and posteria tibia motor nerves. (Tr. at 92.)

(34)

Mr. Krummel first sought psychiatric care in 1992 from Dr. Joyce Siegrist, who treated him for depression. (Tr. at 88.) On cross-examination, Mr. Krummel admitted telling Dr. Siegrist that he had been a nervous person all of his life, that he had great difficulty sleeping for the three years prior, and that he had checked into the hospital for an anxiety attack, thinking it was a heart attack. (Tr. at 87.)

(35)

Dr. Milton Harris testified that he began treating Mr. Krummel for psychiatric problems, focussing on depression and anxiety, beginning in 1992. (Tr. at 88.) Dr. Harris admitted that Mr. Krummel had been diagnosed with a panic disorder prior to the 1994 accident. (Tr. at 256-57.)

42

Prior to 1994, Mr. Krummel had, in Dr. Harris' words, achieved "remission" and was "doing pretty well." (Tr. at 253.) However, Dr. Harris admitted on cross that Mr. Krummel was suffering from anxiety at the time of his last pre-accident visit. (Tr. at 262.)

(36)

Dr. Harris reported that after the accident, Mr. Krummel was depressed, irritable, and not sleeping well. (Tr. at 254.) In addition, Mr. Krummel complained "that he was having a lot of pain." (Tr. at 255.) Dr. Harris acknowledged that Mr. Krummel refused to take his medication or otherwise follow Dr. Harris' instructions. (Tr. at 262.) Dr. Harris eventually discharged Mr. Krummel for refusing to follow through with his recommendations. Mr. Krummel chose not to see another psychologist. (Tr. at 79.) In response to the Court's questioning, Dr. Harris stated that had Mr. Krummel followed an aggressive treatment, at roughly $60 per visit, once a month for a year, he would likely have received psychiatric remission. (Tr. at 267.)

(37)

The parties stipulated that Mr. Krummel's medical expenses to date were $28,029.

(38)

Mr. Krummel testified that he suffers from constant and severe burning on the bottom of his foot. (Tr. at 76.) He claims that standing exacerbates this, and that he often removes his sock and shoe to cool the foot down. He cited a downturn in his marriage. He admitted that he had rejected surgeries suggested by Dr. Parr and by Dr. Rauchwerk. (Tr. at 89-90.)

(39)

Mr. Krummel is and was at the time of the accident employed as a plumber by the St. Tammany Parish School Board. It is uncontested that he missed nine months of work due to the surgical procedures necessitated as a result of his fracture. He has been able to maintain his work with St. Tammany since returning, his work evaluations have remained the same, and he has received his annual percentage raises. (Tr. at 77, 82.) He is drawing roughly the same salary from St. Tammany now as he was before the accident--$22,000 at the time of the accident versus

43

$24,000 now.  (Tr. at 72.)

(40)

Mr. Krummel also had a side plumbing business, Technical Plumbing,[14] which he began operating in the early 1980's.  He testified that beginning in the late 1980's the "economy fell" and "everything shut down," causing his business to suffer.  (Tr. at 37-38.)  In fact, Technical was forced into bankruptcy.  (Tr. at 73.)  He asserted that by the time of the accident it was "starting up again pretty good."  (Tr. at 38.)  After the accident he has done very little private business, and did not re-start Technical Plumbing.  He claims that this decline in Technical Plumbing has cost him roughly $10,000 a year.  (Tr. at 85.)   However, he admitted on cross that he could not name any year in which he actually made anything approaching $10,000 from his side business.  (Tr. at 83-85.)  In fact, plaintiff listed his gross income from his outside plumbing at $1,741, according to his 1992 Schedule C 1040 Form.  (Pla.'s Ex 33 or Def. Ex. N.)

(41)

Mr. Krummel's claim for lost side business goes further.  He stated that prior to the accident he planned to restart a successful business with several trucks and employees.  He seeks lost future wages from the business he hoped to have been running.

(42)

The Court also heard testimony from the other plaintiff in this matter, Ms. Krummel.  She stated that after the accident, Mr. Krummel was "not the same person," that he was "always in pain," and that he often became quiet and removed himself from her presence.  (Tr. at 197.)  At one point he left her for four days, and only since the accident had the possibility of divorce been raised.

### III.  CONCLUSIONS OF LAW

#### A.  LIABILITY

---

[14]For which Mr. Krummel was the sole employee.  (Tr. at 70.)

44

(1)

The Court has jurisdiction over this admiralty and maritime matter pursuant to Federal Rules of Civil Procedure 9(h).

(2)

Despite Bombardier's objections, the Court finds that evidence of Ms. Lester's accident was both relevant and admissible. The same watercraft models was involved in all three incidents, and the facts surrounding Ms. Lester's entrapment, especially in 1996, was substantially similar to Mr. Krummel's.

(3)

The Court finds that entrapment caused by the high footwell was the sole and proximate cause of Mr. Krummel's injury. Having received no instruction or warning to the contrary, the Court does not believe that Mr. Krummel burying his leg into the footwell in an attempt to brace himself and keep from falling off, (Tr. at 111), was contributorily negligent. Given the information available to him and the lack of any warning regarding entrapment or the desirability of falling away from the watercraft, the Court finds that his reaction was instinctive and a reasonable one for an individual unexpectedly thrown off balance and beginning to fall.

(4)

The Court does not find that the 11-inch footwells rendered the product defective in design, as that term is defined in the Restatement (Third) of Product Liability § 2 (1998). Section 2(b) holds that a product is defective when, at the time of sale, "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe." While defects in manufacturing impose strict liability, analyzing defects in design, as with inadequate warnings, requires "some sort of independent assessment of advantages and disadvantages," and the "rationale for imposing strict liability . . . does not apply." *Id.* at cmt. a. Instead, the Restatement "test is whether a reasonable alternative design would, at a reasonable cost, have reduced the foreseeable

45

risks of harm posed by the product and, if so, whether the omission of the alternative design . . . rendered the product not reasonably safe." *Id.* at cmt. d. Certainly the possibility of entrapment was foreseeable. As noted above, Price specifically stated that "whether or not there would be entrapment of the person's foot" was a consideration. (Tr. at 173.) In fact, entrapment was his "first consideration." (Tr. at 319.) However, entrapment was but one of several safety considerations that Bombardier apparently weighed in selecting the footwell dimensions. For some of these, such as steering and turning ability, support for the body, and protection against impacts, especially from the side, lowering the footwell heights could well have had a negative impact. "It is not sufficient that the alternative design [a lower footwell] would have reduced or prevented the harm suffered by the plaintiff [entrapment] if it would also have introduced into the product other dangers of equal or greater magnitude [side impacts and less support and handling ability]." *Id.* at cmt. f. The Court is therefore unwilling to find that lowering the footwell heights or broadening the widths would have, on the whole, made for a safer ride or that failing to do so made the watercraft defective in design.[15]

(5)

However, the Court does find that the height of the footwell posed definite risks and rendered the watercraft defective due to Bombardier's failure to provide adequate instruction or warning regarding the dangers associated with entrapment. Restatement (Third) of Products Liability § 2(c) states that a product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instruction or warnings . . . and the omission of the instructions or warnings renders the product not reasonably safe." Subsection (c) parallels the reasonableness test of subsection (b). *See id.* at cmt.

---

[15]Were the Court to apply the Louisiana Products Liability Act ("LPLA"), the watercraft would not be unreasonably dangerous in design. La. R.S. 9:2800.56 admonishes a court to find unreasonable danger in design only if the likelihood and gravity of damage from the design at issue outweighed the burden and adverse affect of adopting an alternative design capable of preventing the damage. Given all of the safety considerations discussed above, it is far from clear that lowering the footwell heights would have, on the whole, made the watercraft safer or that failing to do so made the watercraft unreasonably dangerous in design.

i.

(6)

While "the defectiveness concept is more difficult to apply to the warnings context," the Court is guided by factors such as the foreseeability and gravity of the risk, the likelihood that an intermediary will convey the information to the user, and the feasibility and effectiveness of a direct warning to the user. *Id.* at cmt. i. Here, as discussed below, the risk of entrapment was foreseeable. The gravity of potential harm was significant. A warning, affixed to the watercraft and/or contained in the promotional material, manual, or video, would almost certainly have reached Mr. Krummel, who testified that he had reviewed this material before riding. (Tr. at 63-64.) Such a warning would have alerted him to the existence of the risk, so that he could have, by appropriate conduct during his ride, reduced his chance of injury, *see* Restatement § 2 at cmt. i, by not burying his feet in the footwell when he tipped but instead allowing himself to fall free of the watercraft. This burial of his feet and failure to allow himself to fall free is indeed the very action that Bombardier argues would have avoided the injury. If this is so obvious to an experienced manufacturer, they should share this information with the user. Had Mr. Krummel been informed of the potential for entrapment, he could have made an informed decision whether or not to purchase or use the product.[16] Indeed, Mr. Krummel testified that he would not have bought the watercraft had he known about the risk or entrapment, (Tr. at 64), and he sold the watercraft after his injury. Therefore, the Court finds that the watercraft was defective because of inadequate warning and instruction.[17]

(7)

---

[16]The Restatement notes that "the duty to provide warnings for informed decision making have arisen almost exclusively with regard to . . toxic agents and pharmaceutical products." *Id.* Thus, the Court does not rely on this duty in reaching its decision.

[17]Similarly, under the LPLA the watercraft was unreasonably dangerous because of inadequate warning regarding the dangers associated with entrapment. La. R.S. 9:2800.57. Bombardier failed to use reasonable care to provide an adequate warning regarding the footwells and the danger of entrapment. The product was dangerous to an extent beyond that which an ordinary user like the Krummels would have or should have contemplated.

47

Bombardier argues that because the design characteristics of the footwell were clearly visible to Mr. Krummel, (Tr. at 114), the danger of entrapment and the risks associated with burying a foot were clearly visible as well, obviating the necessity of a warning. While a seller "is not subject to liability for failing to warn or instruct regarding risks and risk avoidance measures that should be obvious to, or generally know by, foreseeable product users," Restatement § 2 at cmt. j, such a situation is not presented by the present case. The Court finds that the risks and risk avoidance measures were not apparent to an ordinary consumer.[18]

(8)

The risk of such entrapment should, however, have been reasonably foreseeable to Bombardier.[19] As a manufacturer, Bombardier is "held to the standard of an expert in regards to its own product." *Perkins v. Emerson Elec. Co.*, 482 F. Supp. 1347, 1357 (W.D. La. 1980); *see also Pavlides v. Galveston Yacht Basin, Inc.*, 727 F. 2d 330, 337 (5th Cir. 1984). In fact, Bombardier's extensive testing specifically included looking at "whether or not there would be entrapment of the person's foot." (Tr. at 173.) After thorough design studies and testing, Bombardier may have reasonably concluded that the increased steering and turning ability, body support, comfort, and protection against impacts that counsel for higher footwells outweighed the risks of having the high footwell. Nevertheless, Bombardier failed to warn Mr. Krummel and other consumers about the reasonably foreseeable risk of entrapment.

(9)

Consumer expectations can also play a role in failure-to-warn cases. *See* Restatement § 2

---

[18]"When reasonable minds may differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact." Restatement § 2 at cmt. j.

[19]Bombardier argues that entrapment was not foreseeable, based at least in part on its position that it has sold 70,000 crafts with the identical hull design between 1990 and 1995, and yet did not receive a single complaint until after Mr. Krummel's accident, and only two or three since. (Tr. at 327.) First, the Court finds that the risk of entrapment was foreseeable. Second, the Court finds that Bombardier's inadequate procedures for logging such complaints makes its claim of having received no prior to Mr. Krummel's accident highly suspect.

at cmt. n. Although usually discussed in defect in design cases, just as "consumer expectations regarding the product, including expectations arising from product portrayal and marketing" can play a role, though not a determinative one, in defect-in-design cases, *id*. at cmts. f & g, the Court finds the concept instructive in analyzing a failure-to-warn issue. While not relying on any heightened expectation theory for its holding, the Court notes that Bombardier's promotional material touted "falling overboard" as "an expected part of the fun." Pla.'s Ex. 45, Sea-Doo brochure, "Everybody's Doin' It Safely," at 20.

(10)

The Court does not find that the existence or placement of the touring seat, nor the presence or absence of a proper warning regarding the placement of this touring seat, to be a factor impacting the above analysis.

## B. INJURIES

(11)

The Court finds that plaintiff's psychological problems for the most part preexisted his injury. In addition, by disobeying his treating psychiatrist's recommendations to the point where Dr. Harris felt it necessary to release him as a patient, Mr. Krummel failed to adequately mitigate his damages. The Court's finding is strengthened by the fact that while in the care of Dr. Siegrist, Mr. Krummel's use of Prozac, the very drug he refused to take with Dr. Harris, reduced his anxiety level, improved his temper, and lessened his irritability. (Notes of Dr. Siegrist, 6/18/92, Def. Ex. V.) Mr. Krummel even admitted to her that he had improved since going on Prozac (Notes of Dr. Siegrist, 10/5/92, Def. Ex. V.) While the Court concludes that plaintiff was entitled to the treatment described by Dr. Harris as necessary to achieve remission, one $60 per session visit once a month for a year, or roughly $720 in medical bills, he is not entitled to significantly more for future psychological treatment, as such costs should reasonably have been avoided by following Dr. Harris' course of treatment. Obviously, refusal to accept psychological or psychiatric care can be part of a person's illness. Nevertheless, the evidence does not support this

pathology in this case.

(12)

Mr. Krummel's medical expenses at the time of trial are not in dispute. The parties stipulated to $28,029.

(13)

As to Mr. Krummel's future medical bills, the Court again finds that the evidence is inconclusive as to whether plaintiff is or will suffer from RSD. There is more than adequate evidence that much of Mr. Krummel's pain is in fact psychosomatic. In addition, Mr. Krummel's behavior in choosing not to follow his doctors' prescribed courses of treatment has significantly increased the chance of and exacerbated the extent of any permanent physical pain or disability he may suffer. As his own Dr. testified, if someone seeks treatment for RSD soon after an accident, "I should be able to treat them pretty much readily, and I think that they would get better, as opposed to [Mr. Krummel]." (Parr Depo. at 29.) Therefore, the Court is not inclined to saddle defendants with future damages that Mr. Krummel could have avoided by following proper courses of treatment.

(14)

The parties have stipulated that Mr. Krummel missed nine months of work as a plumber with the St. Tammany Parish School Board due to his accident and subsequent surgical procedures. Nine months lost wages at an average salary of roughly $23,000 translates into a loss of earnings of approximately $17,250 from the Board.

(15)

Mr. Krummel claims to have suffered lost income and future lost earnings potential as a result of the down turn of his private plumbing business. The Court finds that Mr. Krummel has only shown an outside income of roughly $1,800 a year prior to the accident. Beyond mere hope, Mr. Krummel offered no evidence to show that his outside income would have substantially increased but for the accident. Therefore, the Court finds that even if plaintiff has been and will be

permanently unable to return to outside plumbing, his losses only amount to $18,000 (of which $7,150 represents past losses).

(16)

The Court finds that Mr. Krummel has sustained and will continue to sustained some physical as well as mental pain and suffering. The evidence presented to the Court justifies an award of $150,000, of which $90,000 is attributable to the time prior to the trial and $60,000 is allotted for the future.

(17)

The Court finds that Ms. Krummel's loss of service and companionship, recoverable under La. R.S. art 2315 and *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996) is $30,000.

(18)

This is an admiralty case tried without a jury pursuant to the Court's admiralty jurisdiction invoked by Federal Rules of Civil Procedure *9(h). Accordingly, an award of prejudgment interest on past damages is proper, with the starting date and rate of such damages left to the sound discretion of the Court. See Doucet v. Wheless Drilling Co., 467 F.2d 336 (5th Cir. 1972); see Marathon Pipe v. M/V SEA LEVEL II, 806 F.2d 585 (5th Cir. 1986). The Court finds that an award of prejudgment interest from the date of judicial demand is appropriate in this case at a rate of 5.67% on plaintiffs' past damages.*

*IV.*

*SUMMARY*

*On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiffs, Robert Krummel and Patricia Krummel, have sustained damages due to defendants' failure to warn them about the risk of leg entrapment in their Sea-Doo GTX watercraft. Accordingly, Robert Krummel is entitled to recover from defendants Bombardier, Inc. and Bombardier Corporation the following damages: $24,400.00 for past earnings lost; $10,850.00 for future earnings lost; $28,749.00 for past medical expenses; $90,000.00 for past pain and suffering;*

*and $60,000.00 for future pain and suffering. Patricia Krummel is entitled to $15,000.00 for past loss of service and companionship, and $15,000.00 for future loss of service and companionship.*

*Additionally, Robert Krummel is entitled to prejudgment interest on the above past losses totaling $143,149.00 at the rate of 5.67% per annum from the date of judicial demand until the judgment is satisfied, and post judgment interest at the legal rate on the above itemized future losses totaling $70,850.00 from the date of judgment until satisfied. Patricia Krummel is entitled to prejudgment interest on the above past losses totaling $15,000.00 at the rate of 5.67% per annum from the date of judicial demand until the judgment is satisfied, and post judgment interest at the legal rate on the above itemized future losses totaling $15,000.00 from the date of judgment until satisfied.*

*This is the judgment of the Court.*